2004 UT 82

Jau–Fei CHEN, individually and as the natural guardian of Chi Wei Zhang, E. Lei Zhang, and E.E. Zhang, her minor children, Rui–Kang Zhang, Plaintiffs and Appellees,

v.

Jau–Hwa STEWART, et al., Defendants.

E. Excel International, Inc., Cross–Claimant,

v.

Jau–Hwa Stewart, Cross–Defendant and Appellant.

E. Excel International, Inc., Third–Party Plaintiff and Appellee,

v.

Taig Stewart; Beverly Warner; Angela Barclay; Dale Stewart; Hwan Lan Chen; Sheue Wen Smith; Kim O'Neill; Byron Murray; Apogee, Inc., a Utah corporation; Apogee Essence International Philippines, Inc., a Philippine corpora-tion; Excellent Essentials International Corporation, a Philippine Corporation; USA Apogee, Ltd., a Hong Kong corporation; Shannon River, Inc., a Utah corporation; Shannon Heaton; Sam Tzu; Richard Hu; Bryan Hyman; Paul Cooper; and John Does I through X, Third–Party Defendants and Appellants.

No. 20020927.

Supreme Court of Utah.

Oct. 8, 2004.

Rehearing Denied Nov. 24, 2004.

Michael R. Carlston, Richard A. VanWagoner, David L. Pinkston, Ryan M. Harris, James S. Lowrie, Michael D. Zimmerman, Todd M. Shaughnessy, James D. Gardner, Kimberly Neville, Salt Lake City, for plaintiffs.

Mark A. Larsen, David S. Hill, Jon K. Stewart, Stacy McNeill, Daniel L. Berman, Stephen R. Waldron, H. Thomas Stevenson, Salt Lake City, for defendants.

Kim O'Neill, defendant pro se.

Byron Murray, defendant pro se.

DURHAM, Chief Justice:

## INTRODUCTION

¶ 1 On January 10, 2001, plaintiff Jau–Fei Chen brought suit against her sister, defendant Jau–Hwa Stewart, and the family corporation, E. Excel, of which Jau–Hwa was president at that time. In the suit Jau–Fei claimed corporate waste, breach of fiduciary duty, and improper removal of a director. On March 13, 2001, the parties stipulated to the removal of Jau–Hwa Stewart from her position as president of E. Excel and agreed to the appointment of an interim CEO, Larry Holman, to run the company during the pendency of the lawsuit. On October 29, 2001, the interim CEO filed a cross-claim against Jau–Hwa Stewart and third-party defendants Hwan Lan Chen (Jau–Hwa and Jau–Fei's mother) and Taig Stewart, (Jau–Hwa Stewart's husband) as well as other individuals the court later found to have been working in concert with Hwan Lan Chen and Jau–Hwa Stewart. On October 16, 2002, the trial court entered a preliminary injunction barring all defendants from worldwide competition with E. Excel. Within ten days, Hwan Lan Chen filed a motion, in which Jau–Hwa and Taig Stewart joined, to vacate the trial court's orders relating to Mr. Holman's appointment as interim CEO. The trial court denied Hwan Lan Chen's motion to vacate. This court granted defendants' petition for an interlocutory appeal from the trial court's decision. We affirm.

## BACKGROUND

¶ 2 The respective parties tell two different stories about the events that gave rise to this lawsuit; the facts, however, tell only one. Over 200 pages of findings of fact and conclusions of law entered by the trial court narrate a tale of intrigue, deceit, and family strife of surprising proportions.

■ ¶ 3 The trial court's findings directly contradict defendants' characterization of the underlying dispute. Because defendants have failed to properly marshal the evidence in support of the trial court's findings of fact, we do not consider those findings properly challenged and, therefore, assume the evidence supports them. *Utah Med. Prods., Inc. v. Searcy*, 958 P.2d 228, 233 (Utah 1998). As a result, we rely on those findings in reciting the facts here.

¶ 4 E. Excel International, Inc. (E. Excel) is a manufacturer of nutritional supplements and skin care products sold both nationally and internationally. In the United States and Canada, the products are sold directly through multilevel marketers. In Asia, the products are sold to a single territorial owner in each of the major markets, who in turn sells the products through a multilevel marketing network. Members of the Chen family control the corporation and have served in various roles as directors, officers, or employees of E. Excel. Prior to the events that form the basis of the present litigation, E. Excel was run by Jau–Fei Chen (Dr. Chen) as president and her sister Jau–Hwa Stewart (Ms. Stewart) as vice president.

¶ 5 Although this is not the Chen family's first serious internal feud,[1] in 2000 a particularly vicious dispute arose. In the early part of that year, Ms. Stewart and her mother, Hwan Lan Chen (Madame Chen), came to believe that Dr. Chen's husband, Rui–Kang Zhang, had been using company funds to support a mistress in California. They insisted that Dr. Chen immediately divorce her husband and give up custody of her children. When Dr. Chen refused, Ms. Stewart and Madame Chen demanded that both Dr. Chen and her husband end their affiliation with E. Excel. Dr. Chen again refused. Unable to convince Dr. Chen to remove herself voluntarily, Ms. Stewart and Madame Chen turned to more aggressive measures.

¶ 6 At the time the present dispute arose, the ownership of the company rested with Ms. Stewart, who possessed a 25% minority share in the company, and the three minor children of Dr. Chen, who possessed a combined 75% share. In September 2001, pur-

---

1. Previously, Ms. Stewart reported her brother to the Internal Revenue Service and U.S. Customs. As a result of her information, he was prosecuted, sent to prison, and assessed several million dollars in fines and unpaid taxes. Ms. Stewart received $2 million in compensation from the IRS for her information.

porting to act as trustee for Dr. Chen's children, Ms. Stewart claimed control of 100% of the outstanding shares and removed Dr. Chen from the board of directors. She then installed her husband, Taig Stewart, and Madame Chen as new directors.[2] The new board voted to remove Dr. Chen as president of E. Excel, appointing Ms. Stewart in her place. Acting as president of E. Excel, without authorization from the board or any justifiable business reason, Ms. Stewart transferred nearly $2 million from E. Excel to her personal account. Ms. Stewart and Madame Chen then proceeded to attack the long-term distributors still loyal to Dr. Chen by stopping the shipment of supplies and transferring millions of dollars to Asian markets to establish new distribution networks.

¶ 7 On January 10, 2001, Dr. Chen brought derivative claims against Ms. Stewart and E. Excel, alleging corporate waste, breach of fiduciary duty, and improper removal of a director. That same day, the court granted a temporary restraining order prohibiting Ms. Stewart from violating E. Excel's exclusive contracts with the territorial owners and from acting as president and spokesperson of E. Excel. The order also required Ms. Stewart to fulfill all pending orders from the territorial owners. The court held evidentiary hearings from January 19, 2001, to February 21, 2001, in order to determine whether the temporary restraining order should be converted into a preliminary injunction. During that time a series of increasingly bizarre events unfolded, manifesting Ms. Stewart and Madame Chen's intent to either squeeze Dr. Chen out of the corporation or destroy it entirely. In defiance of the temporary restraining order, Ms. Stewart continued to ship products to the new distributors, using "front" companies rather than shipping directly to them, and omitting the names of recipients from the shipping orders. Orders in transit to the new distributors were not stopped, and the only order shipped to a long-term distributor was rejected by the recipient country's government as adulterated. As it became increasingly clear that the court would grant a preliminary injunction in

Dr. Chen's favor and remove Ms. Stewart as president of the company, defendants set out to disable E. Excel and set up a competing enterprise, Apogee, in its place. To this end, Ms. Stewart and the third-party defendants who assisted in the scheme disabled the surveillance system that monitored activities at E. Excel's warehouse and offices. They stole, converted, and destroyed millions of dollars worth of E. Excel's inventory, equipment, business records, and computer files. In one of the more bizarre episodes of this case, the defendants purchased mice at a pet store and released them into the warehouse, thereafter claiming that it was necessary to remove the product from the warehouse due to a rodent infestation.

¶ 8 Matters came to a head when, on February 13, 2001, a tape of a recorded conversation between Ms. Stewart and two new distributors located in Asia was anonymously delivered to Dr. Chen and her attorneys. During the conversation, Ms. Stewart and the distributors agreed to deny knowledge of certain critical matters during the evidentiary hearings and blame Dr. Chen for harmful events caused by Ms. Stewart or others. The trial court entered the tape into evidence and referred the recording and a transcript of testimony before the court to the county attorney.

¶ 9 On February 21, 2001, following the trial court's evidentiary hearings, all parties stipulated to an interim order. Among other things, the order prohibited Ms. Stewart from interfering with any contract between E. Excel and its distributors or third parties and required her to return to E. Excel's corporate headquarters any corporate assets in her custody. It also provided for the removal of Ms. Stewart as president of E. Excel, the removal of Madame Chen and Taig Stewart from the board, and the reinstatement of Dr. Chen and her husband to the board. Finally, the interim order directed the appointment of an interim CEO to conserve the remaining assets of E. Excel and to operate the company pending the outcome of the suit. The order provided that

---

**2.** The trial court later ruled that the children's shares had not been properly transferred to a trust controlled by Ms. Stewart and that, as a result, her vote of these shares and all actions she subsequently took as E. Excel's president were void ab initio.

the parties would be allowed to choose the interim CEO; however, if they could not reach an agreement, the CEO would be appointed by the court. After the parties failed to agree on an individual, the court appointed Larry Holman on March 13, 2001, empowering him as interim CEO/special master with "full executive authority to act on behalf of the company, and conduct its business, subject to the continuing oversight of the board of directors and the Court."

¶ 10 When Mr. Holman arrived, E. Excel was dangerously close to going out of business. Though highly profitable just six months earlier, E. Excel's current liabilities now exceeded its current assets by $1.6 million and it faced imminent loss of its operating capital because it had defaulted on a $1 million line of credit with Zion's Bank.[3] Upon arrival, Mr. Holman found that Ms. Stewart and the other members of the conspiracy had removed the documents E. Excel needed to operate, including financial records, product information, invoices for accounts payable, and records of E. Excel's banking relationships.

¶ 11 Shortly thereafter, Mr. Holman learned that two of the new distributors had received more than $1 million worth of product from Ms. Stewart without paying for it, and were selling it at 30–40% below customary prices. These "dumping" practices by the new distributors made it virtually impossible for legitimate E. Excel distributors to compete and raised concerns among customers regarding the quality of the product and the future prospects of the company. These concerns were reflected in the significant decrease in the number of low-level sellers signing up with E. Excel in parts of Asia, a benchmark for the success of a multi-level marketing enterprise.[4] Mr. Holman was also confronted with claims by the long-term distributors, who had filed suit against E. Excel while Ms. Stewart was in charge for breach of their exclusive contracts. Damages levied against the company as a result of those suits could potentially have reached tens of millions of dollars.

¶ 12 In response to these events, and in order to settle a dispute regarding the authority of Mr. Holman to direct litigation on behalf of the corporation, the trial court modified the interim order on May 11, 2001. The new order clarified that Mr. Holman had "full executive authority to direct and control, initiate, dismiss, settle or otherwise determine [E. Excel's] interests in all business relationships, assets, disputes or lawsuits, subject to the approval of the Board of Directors."

¶ 13 With court approval, Mr. Holman caused the company to enter a Master Settlement Agreement on June 1, 2001. The purpose of the Agreement was to restore minimal cash flow, settle litigation that was draining E. Excel of resources, and obtain waivers of the claims brought by the long-term distributors. Though it did not restore E. Excel to its economic position prior to the events of early 2001, the Agreement did, in small measure, mitigate E. Excel's damages and thus kept the company from imminent bankruptcy.

¶ 14 However, despite the interim order, Ms. Stewart and Madame Chen continued to work hand-in-hand to establish the Apogee enterprise so that the fledgling corporation would be ready to take the place of E. Excel. Madame Chen arranged for the transfer of some $3.5 million into a concealed account, which was used by Apogee for various business expenses. Madame Chen paid $1.2 million in cash, drawn from the concealed account, for land to be used by Apogee, and paid $3.2 million in construction costs for the new Apogee facility. Madame Chen's supporting role was also manifested by Ms. Stewart's own testimony: "I really can't do anything with my own idea. My mother's the one with the money. I have no money. . . . In the first place you have to have some cash in order to really make things

---

3. Ms. Stewart apparently never informed Mr. Holman of the company's financial condition. Moreover, given the liquidity crisis, her earlier transfer of nearly $2 million from E. Excel to her personal accounts is particularly troubling.

4. The company experienced an approximately 50% drop in the number of new low-level sellers who signed up with E. Excel in the Philippines and nearly an 88% decrease in new enrollees in Taiwan.

happen." Ms. Stewart even claimed that prior to her resignation as a director of E. Excel, everything regarding Apogee "was my mother's idea."

¶ 15 During the summer of 2001, Dr. Chen filed two motions for contempt against Ms. Stewart, alleging extensive violations of the temporary restraining order. On October 29, 2001, E. Excel, under the direction of Mr. Holman, filed a cross-claim against Ms. Stewart as well as third-party complaints against several third-party defendants, including Madame Chen. E. Excel sought preliminary and permanent injunctions to prevent defendants from competing with E. Excel so that the corporation could recover from the damage wrought by defendants. On October 31, 2001, a temporary restraining order was granted.

¶ 16 The trial court combined the hearings on the contempt and preliminary injunction motions on November 27, 2001, and from that time through the spring of 2002, the district court heard approximately twenty-two days of testimony and argument on these motions. Ms. Stewart filed a motion to disqualify Mr. Holman, but the lower court deferred hearings on the matter, stating that although such claims were serious, the court simply did not have the resources to consider them yet. On August 18 and 20, 2002, the court entered extensive findings of fact and conclusions of law. Two months later, on October 16, 2002, the trial court entered an order granting E. Excel's motion for a preliminary injunction. Eight days later, Madame Chen filed a motion to vacate and set aside the trial court's orders relating to the interim CEO's appointment, in which Ms. Stewart and her husband joined. On January 24, 2003, the court denied Madame Chen's motion to vacate.

¶ 17 The trial court's decision to deny Madame Chen's motion to vacate and set aside the trial court's orders relating to the appointment of the Interim CEO is the subject of this interlocutory appeal.

## STANDARD OF REVIEW

¶ 18 Due to the significance of the standard to be applied in the present case, we briefly restate the various standards of review. We then list the issues and the applicable standards in order of their treatment in the analysis portion of the opinion.

 ¶ 19 A trial court's findings of fact will not be set aside unless clearly erroneous. *State v. Pena,* 869 P.2d 932, 935–36 (Utah 1994). In order to establish that a particular finding of fact is clearly erroneous, "[a]n appellant must marshal the evidence in support of the findings and then demonstrate that despite this evidence, the trial court's findings are so lacking in support as to be against the clear weight of the evidence." *In re Estate of Bartell,* 776 P.2d 885, 886 (Utah 1989) (internal quotations omitted). If the evidence is inadequately marshaled, this court assumes that all findings are adequately supported by the evidence. *In re Estate of Beesley,* 883 P.2d 1343, 1349 (Utah 1994). On the other hand, whether the trial court applied the proper legal standard is a question of law that is reviewed for correctness. *Pena,* 869 P.2d at 936 ("[A]ppellate courts have traditionally been seen as having the power and duty to say what the law is and to ensure that it is uniform throughout the jurisdiction.").

 ¶ 20 The application of a legal standard, once articulated, is a slightly different issue, one which involves varying degrees of discretion depending on the standard in question. *Id.* at 936–37, 938. If the application of the standard is extremely fact sensitive, then the reviewing court should generally give the trial court considerable discretion in determining whether the facts of a particular case come within the established rule of law.[5] *Beesley,* 883 P.2d at 1347–48. Even where the defendants purport to challenge only the legal ruling, as here, if a determination of the correctness of a court's application of a legal standard is extremely fact-sensitive, the defendants also have a duty to mar-

---

5. This is not to say that all fact-sensitive matters require broad grants of discretion. *See, e.g., State v. Warren,* 2003 UT 36, ¶ 12, 78 P.3d 590 ("When a case involves the reasonableness of a search and seizure, we afford little discretion to the district court ....") (internal quotations omitted).

shal the evidence. *See, e.g., id.* at 1347–49 (explaining that failure of the appellant to marshal the evidence meant findings were presumed valid, proving fatal to her legal argument).

¶ 21 The standards of review of the various questions presented in this appeal are as follows:

¶ 22 (1) Did appellants waive their right to challenge the appointment and empowerment of the special master?

■ ¶ 23 The issues of equitable excuse and waiver are mixed questions of law and fact and we therefore grant broadened discretion to the trial court's findings. *U.S. Realty 86 Assocs. v. Sec. Inv., Ltd.*, 2002 UT 14, ¶ 11, 40 P.3d 586; *see also Pledger v. Gillespie*, 1999 UT 54, ¶ 16, 982 P.2d 572 ("[Waiver] presents mixed questions of law and fact: whether the trial court employed the proper standard of waiver presents a legal question which is reviewed for correctness, but the actions or events allegedly supporting waiver are factual in nature and should be reviewed as factual determinations.").

¶ 24 (2) Was the trial court correct in holding that the preliminary injunction did not violate Madame Chen's due process rights despite her absence during the initial portion of the hearings?

■ ¶ 25 Constitutional issues, including questions regarding due process, are questions of law that we review for correctness. *In re K.M.*, 965 P.2d 576, 578 (Utah Ct.App. 1998) (citing *State v. Holland*, 921 P.2d 430, 433 (Utah 1996) ("[T]he ultimate question of whether the trial court strictly complied with constitutional and procedural requirements for entry of a guilty plea is a question of law that is reviewed for correctness.")). Due process, however, "is not a technical conception with a fixed content unrelated to time, place, and circumstances." *Dairy Prod. Servs., Inc. v. City of Wellsville*, 2000 UT 81, ¶ 49, 13 P.3d 581 (quoting *Cafeteria Workers Union v. McElroy*, 367 U.S. 886, 895, 81 S.Ct. 1743, 6 L.Ed.2d 1230 (1961)). "The requirements of due process depend upon the specific context in which they are applied." *V–1 Oil Co., v. Dep't of Envtl.* *Quality*, 939 P.2d 1192, 1196 (Utah 1997). However, because this question requires the application of facts in the record to the due process standard, we incorporate a clearly erroneous standard for the necessary subsidiary factual determinations. *State v. Hubbard*, 2002 UT 45, ¶ 22, 48 P.3d 953.

¶ 26 (3) Did the lower court abuse its discretion in granting the preliminary injunction that barred the defendants from worldwide competition with E. Excel?

■ ¶ 27 A trial court's decision to grant a preliminary injunction is reviewed for abuse of discretion. "[I]n granting or refusing interlocutory injunctions the court shall similarly set forth findings of fact … [which] shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses." Utah R. Civ. P. 52(a). This court will "reverse the trial court's findings of fact … only if they are clearly erroneous as demonstrated by the challenger's marshaling of the evidence." *Utah Med. Prods.*, 958 P.2d at 231 (internal quotations omitted).

## ANALYSIS

¶ 28 Defendants' claims depend on two key issues: (1) whether the appointment of the interim CEO was proper and (2) whether the preliminary injunction barring appellants from worldwide competition was justified. Within each of these two main questions are various sub-issues and a myriad of arguments. We need not discuss all of the defendants' arguments; however, given the complexity of this case and the trial court's relatively novel use of a court-appointed officer, we feel it appropriate to discuss several of the issues in addition to those upon which we eventually dispose of this case. Moreover, given the fact that this is an interlocutory appeal, with an appeal of the trial court's overall resolution of the case apparently making its way to us, we use this opportunity to review questions that may shape subsequent developments in this case. *See* Utah R.App. P. 37.

¶ 29 The first major issue—the propriety of the appointment of an interim CEO—is

dealt with in section I. In that section, we hold that the defendants' objection does not raise an issue of subject matter jurisdiction and that the trial court correctly determined that Madame Chen's claim challenging the appointment of the interim CEO is barred by the doctrine of waiver. Furthermore, we hold that even if Madame Chen had not waived her right, the trial court had the equitable authority to appoint an interim CEO with judicial immunity. In section II, we decide the second major issue—the trial court's decision to grant the preliminary injunction. In this section we affirm the trial court's decision to grant the preliminary injunction, holding that it was not an abuse of discretion and did not violate Madame Chen's due process rights.

¶ 30 As a preliminary matter, we note that this dispute is not as complicated as defendants' counsel asserts. At the core of this case, the trial court, based on competent evidence, identified an insatiable appetite for revenge. Nearly 20,000 pages of combined record, exhibits, reports, and briefs stand witness to the immense financial resources that this family has and is willing to expend in pursuit of that revenge. Approximately 500 pages of briefs and addenda have included an array of arguments, issues, and cases having little bearing on our decision today. Notably, defendants' briefs before this court omit virtually any reference to the 206 pages of findings of fact upon which the resolution of the issues on appeal so heavily rely.

## I. DEFENDANTS WAIVED THEIR RIGHT TO CHALLENGE THE APPOINTMENT, EMPOWERMENT, AND ACTIVITIES OF THE SPECIAL MASTER

¶ 31 Defendants appeal the trial court's holding that Madame Chen waived any right to challenge the appointment of the interim CEO by waiting over ten months to protest Mr. Holman's appointment. The trial court held that Madame Chen waived her right by failing to object in a timely manner. The trial court also noted that Madame Chen's involvement in the litigation and the difficulties she created when E. Excel tried to serve

her with process further supported denial of her claims under the doctrine of waiver.

¶ 32 Defendants contend on appeal, however, that their objection to the appointment of the interim CEO raises an issue of subject matter jurisdiction and cannot be waived. Defendants also argue that even if their objection was subject to waiver, they neither implicitly nor explicitly waived their right to object. We reject both arguments. The claim defendants bring does not properly challenge the subject matter jurisdiction of the trial court, and the facts support the trial court's conclusion that defendants waived their right to object to the appointment of the interim CEO.

### A. Defendants' Objection to the Interim CEO's Appointment Does Not Raise an Issue of Subject Matter Jurisdiction

¶ 33 Defendants attempt to bypass the doctrine of waiver by characterizing their claim as an objection to the court's subject matter jurisdiction. They claim that the appointment of a rule 53 special master with the powers of an executive officer exceeded the trial court's subject matter jurisdiction. Because an objection raising an issue of the court's subject matter jurisdiction cannot be waived and can be brought at any time, defendants argue the court erroneously ruled that Madame Chen waived her right to object to the appointment of the special master.

¶ 34 Defendants correctly assert that subject matter jurisdiction cannot be waived. *See Barnard v. Wassermann*, 855 P.2d 243, 248 (Utah 1993) ("This court has made clear that challenges to subject matter jurisdiction may be raised at any time and cannot be waived."). The claim they bring, however, does not raise an issue of subject matter jurisdiction.

¶ 35 Jurisdiction is "a many-hued term." *United States v. Wey*, 895 F.2d 429, 431 (7th Cir.1990). Two of the term's uses are explained in the Restatement of Judgments:

[W]hat is indicated by the reference to the "subject matter" is the existence of a relationship between the claim under adjudication and the forum that justifies

the exercise of jurisdiction.... This usage can result in confusion, however, owing to the fact that the term "subject matter jurisdiction" is also used commonly as the synonym of the term "competence."

Restatement (Second) of Judgments § 11 (1982).[6] Unlike a challenge to the court's competence to decide the case, only an objection to the court's subject matter jurisdiction, or the relationship between the claim and the forum that allows for the exercise of jurisdiction, is not subject to waiver. *Barnard,* 855 P.2d at 248.

¶ 36 One of the consequences of the nonwaivable nature of subject matter jurisdiction is that attempts are sometimes made to mischaracterize other jurisdictional elements as defects in subject matter jurisdiction in order to revive an otherwise belated objection. *See Morrison v. Bestler,* 239 Va. 166, 387 S.E.2d 753, 756 (1990) (citing Restatement (Second) of Judgments § 11 (1980)). Defendants have made just such an attempt here.

¶ 37 Defendants frame the trial court's appointment of Mr. Holman as the empowerment of a rule 53 special master with the powers of an interim CEO. They then object on the grounds that the court had no such power under rule 53, arguing that empowering a rule 53 special master with the extrajudicial capabilities of a corporate executive "far exceeded the lawful subject matter jurisdiction of a judge or special master under rule 53."

¶ 38 Subject matter jurisdiction, however, is the authority of the court to decide the case. *Salt Lake City v. Ohms,* 881 P.2d 844,

853 (Utah 1994). Here, the trial court is a court of general jurisdiction over a broad range of actions under the common law and as set forth in Utah Code: "The district court has original jurisdiction in all matters civil and criminal, not excepted in the Utah Constitution and not prohibited by law." Utah Code Ann. § 78–3–4 (2003). A trial court's authority to appoint an officer such as an interim CEO arises out of its jurisdiction to hear the underlying case and is ancillary to the primary relief sought. Utah R. Civ. P. 66(a) ("A receiver may be appointed by the court in which an action is pending or has passed to judgment...."); *Kelleam v. Md. Cas. Co.,* 312 U.S. 377, 381, 61 S.Ct. 595, 85 L.Ed. 899 (1941). Thus, in order to challenge subject matter jurisdiction, defendants are required to challenge the authority of the court to hear the underlying case; they have not done so.

¶ 39 Defendants erroneously assume that the sole source of the court's power is rule 53 of the Utah Rules of Civil Procedure. However, as will be discussed more fully below, the trial court has broad equitable power to appoint a quasi-judicial officer such as a receiver, special master, or interim CEO. If, as it appears, defendants are using "jurisdiction" in a more general sense to describe the court's power or authority (i.e., power to appoint an interim CEO when it is clear the court has jurisdiction to decide the underlying dispute), then their challenge is properly directed to the equitable power of the court to make such an appointment. Again, defendants have not so characterized their challenge.[7]

---

6. The Virginia Supreme Court has also aptly described these and other uses of the term.

> The term jurisdiction embraces several concepts including subject matter jurisdiction, which is the authority granted through constitution or statute to adjudicate a class of cases or controversies; territorial jurisdiction, that is, authority over persons, things, or occurrences located in a defined geographical area; notice jurisdiction, or effective notice to a party or if the proceeding is *in rem* seizure of a *res;* and "the other conditions of fact" must exist which are demanded by the unwritten or statute law as the prerequisites of the authority of the court to proceed to judgment or decree.

*Morrison v. Bestler,* 239 Va. 166, 387 S.E.2d 753, 755 (1990) (quoting *Farant Inv. Corp. v. Francis,* 138 Va. 417, 122 S.E. 141, 144 (1924)).

7. The United States Supreme Court has drawn a similar distinction between subject matter jurisdiction and the "jurisdiction" (or power and authority) of a similar court-appointed officer. In *Gomez v. United States,* 490 U.S. 858, 876, 109 S.Ct. 2237, 104 L.Ed.2d 923 (1989), the Court used the term "jurisdiction" to describe the authority of a magistrate judge. However, "it is also clear that the Court (in *Gomez* ) was not using the term 'jurisdiction' in the sense of nonwaivable subject matter jurisdiction." *Clark v. Poulton,* 963 F.2d 1361, 1367 (10th Cir.1992)(citing *Peretz v. United States,* 501 U.S. 923, 953, 111

¶ 40 Though repeatedly described as a claim of subject matter jurisdiction in their brief, defendants' objection is essentially to the propriety of the court's powers in a context in which it clearly has jurisdiction. Their contention is thus "not a case where a court has exceeded or refused to exercise its jurisdiction; it is rather a question of whether the judge erred in ruling on matters within his jurisdiction." *Cruz v. Hauck,* 515 F.2d 322, 327 (5th Cir.1975) (internal quotations omitted).

¶ 41 In the alternative, defendants argue that even if they had been able to waive their right to object, Madame Chen and the Stewarts never expressly or impliedly did so. In this secondary argument, defendants appear to challenge directly the trial court's decision to grant waiver in regard to matters within the court's jurisdiction. Again, however, defendants fail to muster an adequate challenge.

### B. *Defendants Waived Their Right to Object to the Appointment of the Interim CEO*

¶ 42 In their alternative argument, which challenges the propriety of the trial court's decision to bar their objection based on waiver, defendants fail to convince us that the trial court abused its discretion in reaching such a conclusion. The unchallenged findings of fact present no evidence that the trial court abused its discretion in barring the defendants' objections.

¶ 43 Defendants claim that Madame Chen had no right to object because she was not a party to the suit at the time the trial court appointed the interim CEO and did not become a party until ten months thereafter. Thus they argue that when she did finally join the lawsuit as a party, she filed her motion to vacate the orders relating to the appointment of the interim CEO in a timely manner. In the case of Ms. Stewart and Taig Stewart, defendants assert that because they challenged the appointment of the interim CEO in their July 23, 2002, motion to disqualify Mr. Holman as special master and interim CEO, they did not waive their right to challenge his appointment.

¶ 44 As stated above, waiver is a mixed question of law and fact, and discretion will be given to the trial court in the application of this doctrine. In light of the unchallenged facts supporting the trial court's holding, it is clear that Madame Chen and the Stewarts did not bring their objection to the appointment of the interim CEO in a timely manner.

¶ 45 Over ten months after Madame Chen became a party to the suit, she entered her motion to vacate challenging the appointment and actions of the interim CEO. Similarly, Ms. Stewart and Taig Stewart not only stipulated to the original orders appointing Mr. Holman as interim CEO/special master,[8] but also participated in the litigation for nearly a year before bringing an objection to Mr. Holman's appointment.[9] Furthermore, both Madame Chen and Ms. Stewart waited to bring their objection until after Mr. Holman took actions against them, including filing

S.Ct. 2661, 115 L.Ed.2d 808, (1991) (Scalia, J. dissenting) ("We used [the term 'jurisdiction'] in *Gomez* as a synonym for 'authority,' not in the technical sense involving subject matter jurisdiction.")). Following the Supreme Court's use of the term "jurisdiction" in *Gomez,* other federal courts have held that issues regarding the appointment of a magistrate or special master and claims that the appointment of a special master is outside the scope of rule 53 of the Federal Rules of Civil Procedure do not pose a subject matter jurisdiction problem. *See, e.g., Clark,* 963 F.2d at 1366–67; *Polin v. Dun,* 634 F.2d 1319, 1321 (10th Cir.1980). At most, they constitute claims of abuse of discretion. *Id.*

8. Defendants contend that they did not stipulate to the March 13, 2001, order appointing Mr.

Holman. However, even though the trial court found that Ms. Stewart had stipulated to that order and defendants make no effort to challenge this factual finding, their argument has little relevance. Because Ms. Stewart waited nearly a year to bring any type of objection to the appointment of the interim CEO, regardless of whether or not she stipulated to the order, she waived her right to raise an objection now.

9. Ms. Stewart waited until January 23, 2002, to file her motion to disqualify Mr. Holman as special master and interim CEO of E. Excel. Because they waited well over a year after the appointment of the interim CEO to file their objection, the Stewarts have no basis independent of Madame Chen's claim, which they have joined, for arguing that their objection should not also be barred for being untimely.

several extensive and unfavorable reports, filing claims against them on behalf of E. Excel, and successfully seeking a preliminary injunction. Defendants have also made no effort to challenge the trial court's reliance on E. Excel's thirty-three-paragraph summary of Madame Chen's involvement in the litigation, the difficulties that she created when E. Excel attempted to serve her, and the general hide-and-seek tactics she employed until E. Excel announced its intention to seek default, all of which the trial court cited as reasons supporting its decision.

¶ 46 Cognizant of the broad discretion we give the trial court on issues of waiver, we affirm its determination that the totality of the circumstances warranted the inference of waiver. *Soter's, Inc., v. Deseret Fed. Sav. & Loan Ass'n*, 857 P.2d 935, 939–41 (Utah 1993). Madame Chen's ten months as an active party in the litigation, her membership on E. Excel's board of directors when the present litigation began, her extensive involvement in the rival Apogee corporation, and the fact that she lived with Ms. Stewart all lead us to conclude, as did the trial court, that Madame Chen had ample opportunity to bring her objection in a timely manner.

¶ 47 Furthermore, if, as defendants assert, Madame Chen, due to her position as a "matriarch in a traditional Chinese family," was an equitable stock owner and intricately involved in the decisions of the company, she could have brought her objection to the appointment of the interim CEO through a motion to intervene or through a derivative suit as an equitable stock owner. *See* Utah R. Civ. P. 23.1, 24. The fact that this, as defendants themselves contend, is a traditional Chinese family, in which the elders play a large, if not controlling, role in the

company's dealings, without regard to corporate formalities, further supports the conclusion that defendants had sufficient opportunity to bring their challenge.

¶ 48 Finally, because the powers of the interim CEO appointed in the present case are largely identical to those of a receiver, the same policy concerns that justify application of the doctrine of waiver to the appointment of a receiver apply here. An objection to a court's decision to appoint a receiver can be waived if not brought in a timely manner. *Score v. Wilson*, 611 P.2d 367, 368 (Utah 1980).[10] The policy behind this rule has been articulated by the Fifth Circuit in *Cruz v. Hauck*:

> A party objecting to a reference should do so prior to or at the time of the reference. If this is infeasible, the objection should be made to the judge at the earliest possible opportunity. Such procedure permits the proper and efficient administration of the judicial process. Otherwise, a party disappointed with a master's report would be able to obtain 'a second bite at the apple' by withholding his objection to the reference until after the report.

515 F.2d 322, 331 (5th Cir.1975) (citations omitted).

¶ 49 Here, the parties specifically agreed that the trial court would appoint an officer to run their corporation because the situation made it impossible for them to do so. Once the parties agree to transfer the responsibility of running the corporation to a court appointed functionary, they cannot wait to see if such a decision fails to serve their interests and subsequently object to the appointment. *See id.* To preclude application

---

10. Similarly, this court has recognized that the right to object to a special master's reports can be waived. *Score v. Wilson*, 611 P.2d 367, 368 (Utah 1980) ("The defendant made no objection to the Master's reports as required by the Utah Rules of Civil Procedure 53(e)(2) and therefore should not be allowed to question the same."); *see* Utah R. Civ. P. 53(e)(2) ("Within 10 days after being served with notice of the filing of the report any party may serve written objections thereto upon the other parties."). It is also well established in federal case law that the right to object to the appointment of a special master can be waived if the objection is not brought in a

timely manner. *See, e.g., Cruz v. Hauck*, 515 F.2d 322, 331 (5th Cir.1975); *Adriana Int'l Corp. v. Thoeren*, 913 F.2d 1406, 1410 (9th Cir.1990) ("An objection to the appointment of a special master must be made at the time of the appointment or within a reasonable time thereafter."); *Regents of the Univ. of N.M. v. Knight*, 321 F.3d 1111, 1127–28 (Fed.Cir.2003) (holding that the objection to appointment of a Special Master can be waived if not made in a timely manner); *Constant v. Advanced Micro–Devices*, 848 F.2d 1560, 1566 (Fed.Cir.1988) ("A party cannot wait to see whether they like the master's findings before challenging the use of a master.").

of the doctrine of waiver here would essentially allow defendants a "second bite at the apple." *Id.* Accordingly, we hold that an objection to the appointment of a court appointed interim CEO is subject to waiver, and was waived by defendants.

## C. Equitable Authority To Appoint an Interim CEO

¶ 50 Had defendants properly fashioned their claim to address the equitable power of the court to appoint an interim CEO, they nevertheless would have failed in their challenge because the trial court has the equitable power to appoint an officer such as an interim CEO.

> Courts have (at least in the absence of legislation to the contrary) inherent power to provide themselves with appropriate instruments required for the performance of their judicial duties. This power includes authority to appoint persons unconnected with the court to aid judges in the performance of specific judicial duties, as they may arise in the progress of a cause.

*Ex Parte Peterson,* 253 U.S. 300, 312, 40 S.Ct. 543, 64 L.Ed. 919 (1920). In situations such as the present case, where misappropriation of corporate assets by insiders is asserted, courts have historically appointed receivers in order to preserve assets during the pendency of the suit. *Richardson v. Ariz. Fuels Corp.,* 614 P.2d 636, 638 (Utah 1980) (citing *Stevens v. S. Ogden Land, Bldg. & Improvement Co.,* 14 Utah 232, 47 P. 81 (1896)). Courts have also generally appointed receivers where a request is made by stockholders of a corporation suing either individually or on behalf of the company, *Stevens,* 47 P. at 83, or where dissent among a corporation's managers prevents the conduct of the business without serious losses. *Shaw v. Robison,* 537 P.2d 487, 490 (Utah 1975). Though somewhat uncommon, the appointment of an interim CEO for the same purpose and with the same powers as a receiver is not unprecedented. *See, e.g., In re Property Co. of Am. Joint Venture,* 110

B.R. 244, 246 (Bankr.N.D.Tex.1990) (appointing interim CEO during bankruptcy action).

¶ 51 The authority to appoint a receiver is based on the court's inherent equitable power. *Interlake Co. v. Von Hake,* 697 P.2d 238, 239 (Utah 1985) ("A receivership is an equitable matter and is entirely within the control of the court.") (citing *Shaw,* 537 P.2d 487). Rule 66 of the Utah Rules of Civil Procedure also recognizes this inherent equitable power. *See* Utah R. Civ. P. 66(a)(6) (allowing appointment of receiver in "cases where receivers have heretofore been appointed by the usages of courts of equity").

¶ 52 Contrary to the assertions of defendants, among a receiver's powers is the authority to conduct and settle litigation in order to manage the company. *Stevens,* 47 at 83 (authorizing receiver to bring suit to obtain books, property, and evidence of indebtedness belonging to the corporation); 19 C.J.S. *Corporations* § 791 (1990) ("A receiver for a corporation, for purpose of litigation, ordinarily stands in the place of the corporation, and may bring any action which the corporation could have maintained."); *Meyer v. Fleming,* 327 U.S. 161, 167–68, 66 S.Ct. 382, 90 L.Ed. 595, (1946)(holding a receiver may settle suits on behalf of company).

¶ 53 Here, rather than appoint a receiver, both parties stipulated to the appointment of an interim CEO/president who, as indicated in the interim order of February 21, 2001, was given "full executive authority to act on behalf of the Company, and conduct its business, subject to the continuing oversight of the board of directors and the Court." The purpose of his appointment was to forestall the erosion of corporate assets and manage the company until all legal issues before the court were resolved. As interim CEO, Mr. Holman was thus given essentially the same powers as those of a receiver. Even in authorizing him to conduct litigation on behalf of the company, the court was not granting him powers outside those of a general executive officer of a corporation or a court-appointed receiver.[11]

---

11. Defendants contend that even had the trial court appointed Mr. Holman as a receiver, he would have been a "pendente lite" receiver, with none of the powers allocated to Mr. Holman as

interim CEO. We need not decide today whether defendants' distinction between "pendente lite" receivers and other types of receivers merits the attention defendants give it. Nor do we need to

¶ 54 The court had the inherent equitable authority to appoint a receiver with the same powers it granted Mr. Holman. As a result, we refuse to hold that such an act was void ab initio simply because the court designated Mr. Holman an interim CEO.[12]

### D. The Court and Parties Decided To Extend Judicial Immunity To the Interim CEO

¶ 55 At the request of the parties, the trial court used its inherent equitable power to extend judicial immunity[13] to the interim CEO. The trial court and the parties decided that to do so the interim CEO would be titled a special master. Although the designation of Mr. Holman as a special master created no confusion at the time, defendants, in these later stages of litigation, have attempted to exploit and use to their advantage the inherent ambiguity in this somewhat atypical use of the special master terminology. We reject defendants' attempts to use this ambiguity to undermine the entire substance of the trial court's rulings. In the future, however, trial courts would do well to be cautious in their use of the title "special master," due to the confusion it can create.

¶ 56 Defendants argue that because Mr. Holman was referred to in the court's order as a special master, his role changed from that of a CEO—whose duty is to preserve corporate assets, protect them from others, and operate the company in a profitable manner—to a rule 53 special master who, as a quasi-judge, is limited to acting as a neutral magistrate. We decline to accept this argument, inconsistent as it is with the clear intent of the parties and the evidentiary record, which shows that Mr. Holman was appointed an interim CEO with the title of special master only for the purpose of providing him the judicial immunity associated with the designation.

¶ 57 The interim order of February 21, 2001, to which both parties stipulated, makes no reference to rule 53 and never mentions the appointment of a special master. It unambiguously establishes that the appointed officer will act as interim CEO.

¶ 58 Like the text of the February order, a March 5, 2001 telephonic hearing discussing the various candidates for the position also illustrates that the court and the parties understood that the interim CEO was not appointed as a neutral judicial magistrate. In that conversation, Ms. Stewart's counsel relied on the fact that the interim CEO would likely be an active participant in the

decide today whether a "pendente lite" receiver has the powers to run the company in a "biased fashion" and bring suit. As heretofore stated, the trial court did not appoint a receiver, or even a "pendente lite" receiver.

12. Because the trial court had the equitable power to appoint an interim CEO in order to preserve the res of the litigation, we need not consider at this time whether a rule 53 special master could be so empowered. However, as plaintiffs point out, the trend has been to allow courts more freedom in appointing a variety of judicial officials to assist them in their duties. In *Plumb v. State*, 809 P.2d 734, 741 (Utah 1990), this court specifically refused to apply the much stricter interpretation of rule 53 of the Federal Rules of Civil Procedure, as set forth in *La Buy v. Howes Leather Co.*, 352 U.S. 249, 256–59, 77 S.Ct. 309, 1 L.Ed.2d 290 (1957) (holding that reference to a special master cannot be justified under the "exceptional condition" language by congested calendars, complex issues, or a lengthy trial). This court held that *La Buy* is too limited in scope and "unnecessarily narrows the trial judge's options in dealing efficiently with the issues presented for decision." *Plumb*, 809 P.2d at 741. We reasoned that *La Buy* was authored long before the widespread use of mag-istrate judges within the federal system softened the federal courts' hostility to delegated judicial authority. *Id.* This tendency to allow courts to appoint a variety of officers to assist in implementing their orders under rule 53, even when they do not seem to fall squarely within the literal terms of rule 53, is seen as well in more recent federal cases. In *Jenkins v. Missouri*, 890 F.2d 65, 67 (8th Cir.1989), the Eighth Circuit rejected the narrow approach to rule 53, asserting that whatever the title, the court's equitable power to appoint an agent to supervise the implementation of its decrees is not terminated or modified by rule 53. Likewise, in *FTC v. World Wide Factors, Ltd.*, the Ninth Circuit recognized that though special master's responsibilities technically met the definition of a receiver, the trial court did not err by designating the court-appointed officer a special master. 882 F.2d 344, 348 (9th Cir.1989).

13. While the term "judicial immunity" historically refers to the immunity extended to judges for their official acts, we use it in this unique context as extending to those appointed to act under the court's direction.

corporate litigation as a basis for arguing that her candidates, a team from the accounting firm of Arthur Anderson, would be more capable of investigating and participating in those claims.

¶ 59 Furthermore, consistent with the role of a CEO acting in the interest of E. Excel, and inconsistent with the functions of a quasi-judicial official, all parties understood and agreed that, in order to run the company, the interim CEO would engage in ex parte communication with both parties in the dispute, as well as other employees and territorial owners. Both parties stipulated to the establishment of a procedure for Mr. Holman's necessary ex parte communications.

¶ 60 The parties also agreed that the interim CEO should be granted judicial immunity. In the March 5, 2001, telephonic hearing the parties expressed concern that any candidate for the job of interim CEO would be wary of accepting due to the likelihood of being drawn personally into the litigation. Consequently, it was agreed that the interim CEO would be accorded the immunities of "a receiver" or "a master." As a result, in its March 13, 2001, order, the trial court appointed Mr. Holman as "interim chief executive officer of E. Excel International, Inc., and as a special master for and on behalf of the Court ... with all rights, protections and immunities available to a special master under the law." When the court revisited its decision to appoint the interim CEO in its January 24, 2003, order dismissing Madame Chen's motion to vacate, it reasserted that it had appointed the interim CEO and had given him the title "special master" because the parties insisted that he receive the same immunities and protections that a special master would receive.

¶ 61 We hold that it was not an abuse of the trial court's discretion to provide Mr. Holman judicial immunity for his actions as interim CEO. The nature of Mr. Holman's responsibilities and the integral role he played in the trial court's ability to properly adjudicate the present case created sufficient grounds for extending Mr. Holman judicial immunity without fully constituting him as a special master. *See Sanders v. Leavitt,* 2001 UT 78, ¶ 19, 37 P.3d 1052; *see also Parker v.*

*Dodgion,* 971 P.2d 496, 498 (Utah 1998) ("Whether a person or entity should be afforded judicial immunity depends upon the specific work or function performed. If the acts were committed 'in the performance of an integral part of the judicial process,' the policies underlying judicial immunity apply and immunity should be granted.") (quoting *Bailey v. Utah State Bar,* 846 P.2d 1278, 1280 (Utah 1993) (citations omitted)). Furthermore, "[t]he courts that have considered the matter have held that a receiver is a court officer who shares the judge's immunity, at least if he is carrying out the orders of his appointing Judge." *T & W Inv. Co. v. Kurtz,* 588 F.2d 801, 802 (10th Cir.1978). Given both the close similarity between Mr. Holman's powers as an interim CEO and those of a receiver, and the integral role he played in the court's ability to adjudicate the case, Mr. Holman should clearly be afforded the same judicial immunity as a receiver, master, or other judicial officer.

¶ 62 We have already noted that relying on rule 53 for the purpose of providing judicial immunity can lead to confusion regarding the source and scope of an appointee's powers, and may make use of this nomenclature problematic in future cases. In this case, however, any confusion appears to have been manufactured after the fact rather than created by the court's order itself; no disagreement about Mr. Holman's powers surfaced until after his actions unfavorably affected defendants. Had Mr. Holman's designation as a special master led to an actual overlap of the quasi-judicial powers of a traditional rule 53 special master and the executive powers of a court-appointed CEO or receiver, the designation could have created conflict issues. However, it is quite clear that did not happen here. The orders of appointment are clear, as is the fact that the parties understood and agreed to them at the time they were issued. However, we encourage trial courts presented with similar situations in the future to rely on other means of granting judicial immunity, including their inherent equitable power, rather than resorting to this somewhat unorthodox use of the title "special master."

## II. PRELIMINARY INJUNCTION

¶ 63 The second major issue raised in this appeal is the propriety of the trial court's decision to grant the preliminary injunction. Defendants challenge the decision on three separate grounds: first, defendants claim that the preliminary injunction was granted against Madame Chen in violation of her due process rights; second, defendants argue that even if the preliminary injunction was not granted in violation of Madame Chen's due process rights, it is facially invalid as a matter of law because barring Madame Chen, Ms. Stewart, and other members of the conspiracy from worldwide competition is far too broad; and third, defendants contend that the facts do not support the court's decision.

¶ 64 After reviewing the arguments and pertinent aspects of the record, we affirm the trial court's decision to reject Madame Chen's due process claims. Madame Chen voluntarily appeared in the early stages of the preliminary injunction hearings, waiving her right to notice, and she makes no showing as to how her formal absence from the suit unduly prejudiced her. Furthermore, we hold that the preliminary injunction was not an abuse of the trial court's discretion. Defendants' failure to properly marshal the evidence undermines their claims regarding both the propriety and scope of the preliminary injunction.

### A. Madame Chen's Due Process Rights

¶ 65 Defendants argue that Madame Chen's right to due process was violated because she was not joined as a party by service of process prior to the commencement of the preliminary injunction proceedings. Moreover, they assert that 50% of the evidence on the preliminary injunction question was received by the court prior to her joining as a party, and that she therefore had no opportunity to object to the evidence and present an opening argument.

¶ 66 In support of this position, defendants quote *Murphy Bros., Inc. v. Michetti Pipe Stringing, Inc.,:* "In the absence of service of process ... a court may not exercise power over a party the complaint names as defendant." 526 U.S. 344, 350, 119 S.Ct.

1322, 143 L.Ed.2d 448 (1999). However, the complete quotation of this passage includes a parenthetical clause referring to a defendant's ability to waive the right to notice. *Id.* ("In the absence of service of process (*or waiver of service by the defendant*), a court ordinarily may not exercise power over a party the complaint names as defendant[,]") (emphasis added). We find the defendants' failure to quote the passage fully particularly interesting given that the omitted parenthetical describes precisely what Madame Chen did.

¶ 67 Article I, section 7 of the Utah Constitution states that "no person shall be deprived of life, liberty, or property, without due process of law." In interpreting this provision, we have previously recognized that " 'due process is not a technical conception with a fixed content unrelated to time, place, and circumstances.' " *Dairy Prod. Servs., Inc. v. City of Wellsville,* 2000 UT 81, ¶ 49, 13 P.3d 581 (quoting *Cafeteria Workers Union v. McElroy,* 367 U.S. 886, 895, 81 S.Ct. 1743, 6 L.Ed.2d 1230 (1961)). "Instead, due process is flexible and, being based on the concept of fairness, should afford the procedural protections that the given situation demands." *Id.* (internal quotation and citation omitted). Thus, "[t]he requirements of due process depend upon the specific context in which they are applied." *V-1 Oil Co. v. Dep't of Envtl. Quality,* 939 P.2d 1192, 1196 (Utah 1997).

¶ 68 Although the exact requirements of due process may vary from situation to situation, the minimum requirements of due process include adequate notice and an opportunity to be heard in a meaningful manner. *See Dairy Prod. Serv.,* 2000 UT 81 at ¶ 49, 13 P.3d 581. "To be considered a meaningful hearing, the concerns of the affected parties should be heard by an impartial decision maker." *Id.* Inasmuch as this question of law requires the application of the facts to the due process standard, we use a clearly erroneous standard for the necessary factual determinations. *See State v. Hubbard,* 2002 UT 45, ¶ 22, 48 P.3d 953.

¶ 69 In the present case, the minimum requirements of due process were satisfied.

Madame Chen had notice and the opportunity to fairly state her case.

¶ 70 Hearings regarding the contempt motions filed against Madame Chen and Ms. Stewart began on October 25, 2001. On November 27, 2001, the contempt hearings were consolidated with the preliminary injunction hearings. On December 12, after hearings on November 27 and 28 and December 10 and 11, Madame Chen's counsel voluntarily entered a notice of appearance "on behalf of . . . Hwan Lan Chen, also known as Madame Chen, and the corporation Apogee Incorporated." By entering such an appearance, Madame Chen effectively waived her right to be served. *McDonald v. Mabee*, 243 U.S. 90, 91, 37 S.Ct. 343, 61 L.Ed. 608 (1917) ("Submission to the jurisdiction by appearance may take the place of service upon the person.") *cited in Mallory Eng'g., Inc. v. Ted R. Brown & Assocs., Inc.*, 618 P.2d 1004, 1007 n. 7 (Utah 1980); *see also Allen v. Coates*, 29 Minn. 46, 11 N.W. 132, 132 (1882) (defect in service can be waived by general appearance if appearance was not induced by fraud or mistake of fact). We conclude, therefore, that the trial court satisfied the first basic requirement of due process: having entered an appearance by way of counsel, it is clear that Madame Chen had adequate notice of the proceedings.

¶ 71 We also conclude that although she was not present for four of the consolidated preliminary injunction/contempt hearings, Madame Chen nevertheless had an opportunity to be heard in a meaningful manner. Madame Chen was present as a party for eighteen of the twenty-two consolidated hearings. These eighteen hearings extended from December 12, 2001, to June 26, 2002. During these six months, Madame Chen never objected to the trial court's reliance on the evidence entered at the early hearing dates she had missed. Furthermore, nowhere does she describe how she was prejudiced or suffered any disadvantage by not being formally represented by counsel in these early hearings. This is particularly significant given that she was an active participant in the preliminary injunction hearing for nearly six months and had every opportunity to present evidence, call new witnesses, recall former witnesses for cross-examination, or to notify the trial judge of any technical or evidentiary objections to the trial testimony.

¶ 72 In rejecting her due process claims, the trial court also found that Madame Chen had *actual* notice of the proceedings. Madame Chen lived with Ms. Stewart, who had been involved in the litigation from the beginning, and Madame Chen also had been involved from the outset of the litigation as a coconspirator with Ms. Stewart. In light of her voluntary waiver of the right to service, the adequate time she had to present her case and challenge, if she desired, the evidence entered in her absence, and her actual notice of the proceedings, we affirm the lower court in rejecting her due process claims. Madame Chen had adequate notice and a fair opportunity to be heard before an impartial decision maker.

### B. Defendants' Failure to Marshal the Evidence

¶ 73 Defendants' challenge to the propriety of the court's decision to enter the preliminary injunction and to its scope, barring defendants from world-wide competition with E. Excel, is entirely unsupported by the evidence.

¶ 74 Defendants claim the evidence establishes only that Madame Chen was a mother, matriarch of a traditional Chinese family, temporary director of E. Excel, and potential competitor to E. Excel through her participation in the Apogee enterprise. Defendants, however, fail to properly marshal the evidence in support of the trial court's findings upon which the preliminary injunction is based. As a result, they do not adequately challenge the trial court's findings. Because they have not properly marshaled the evidence supporting the findings, we accept the trial court's findings on that basis alone. *Wilson Supply, Inc. v. Fraden Mfg. Corp.*, 2002 UT 94, ¶ 26, 54 P.3d 1177. Given the court's factual findings, we affirm the trial court's decision to grant the preliminary injunction as well within its discretion.

¶ 75 Unfortunately, as is manifest by the defendants' failure to marshal in the present case, the requirements of marshaling still do not appear to be understood with the sense

of clarity and urgency we desire. As a result of this lack of understanding, and the fact that defendants' failure to marshal in this case proves virtually fatal to their claims, we take the opportunity to reiterate the requirements of marshaling.

## 1. Marshaling Requirement

¶ 76 In order to challenge a court's factual findings, "an appellant must first marshal all the evidence in support of the finding and then demonstrate that the evidence is legally insufficient to support the finding even when viewing it in a light most favorable to the court below." *Wilson Supply,* 2002 UT 94 at ¶ 21, 54 P.3d 1177. Where a trial court's rulings on highly fact-dependent issues are challenged, this court grants broader than normal discretion to the trial court. *See State v. Pena,* 869 P.2d 932, 936–38 (Utah 1994); *see also Soter's, Inc. v. Deseret Fed. Sav. & Loan Ass'n,* 857 P.2d 935, 939–42 (Utah 1993) (recognizing waiver to be a factually sensitive issue requiring the trial court's exercise of discretion in applying the law to facts). As a result, where the legal standard is extremely fact-sensitive, the appellant has the duty to marshal the evidence. *See In re Estate of Beesley,* 883 P.2d 1343, 1347–49 (Utah 1994). This duty requires an appellant to "marshal all the evidence in favor of the facts as found by the trial court and then demonstrate that even viewing the evidence in a light most favorable to the court below, the evidence is insufficient to support the findings of fact." *Id.* (quoting *Saunders v. Sharp,* 806 P.2d 198, 199 (Utah 1991)).

¶ 77 More recently, the Utah Court of Appeals explained that "in order to properly discharge the duty of marshaling the evidence, the challenger must present, in comprehensive and fastidious order, every scrap of competent evidence introduced at trial which supports the very findings the appellant resists." *Neely v. Bennett,* 2002 UT App 189, ¶ 11, 51 P.3d 724 (emphasis omitted). This does not mean that the party may simply provide an exhaustive review of all evidence presented at trial. *Id.* at ¶ 12 n. 1. Rather, appellants must provide a precisely focused summary of all the evidence supporting the findings they challenge. *Id.* This summary must correlate all particular items of evidence with the challenged findings and then convince us that the trial court erred in the assessment of that evidence to its findings. *W. Valley City v. Majestic Inv., Co.,* 818 P.2d 1311, 1315 (Utah Ct.App.1991). What appellants cannot do is merely re-argue the factual case they presented in the trial court. *Oneida/SLIC v. Oneida Cold Storage & Warehouse Inc.,* 872 P.2d 1051, 1053 (Utah Ct.App.1994).

¶ 78 The process of marshaling is thus fundamentally different from that of presenting the evidence at trial. The challenging party must "temporarily remove its own prejudices and fully embrace the adversary's position"; he or she must play the "devil's advocate." *Harding v. Bell,* 2002 UT 108, ¶ 19, 57 P.3d 1093. In so doing, appellants must present the evidence in a light most favorable to the trial court, *Utah Med. Prods., Inc. v. Searcy,* 958 P.2d 228, 232 (Utah 1998), and not attempt to construe the evidence in a light favorable to their case. *In re Estate of Bartell,* 776 P.2d 885, 886 (Utah 1989). Appellants cannot merely present carefully selected facts and excerpts from the record in support of their position. *Oneida,* 872 P.2d at 1053. Nor can they simply restate or review evidence that points to an alternate finding or a finding contrary to the trial court's finding of fact. *Wilson Supply,* 2002 UT 94 at ¶ 22, 54 P.3d 1177. Furthermore, appellants cannot shift the burden of marshaling by falsely claiming that there is no evidence in support of the trial court's findings. *Id.* This would inappropriately force an appellee to marshal the evidence in order to refute an appellant's assertion of the absence of evidence. *Id.* In sum, to properly marshal the evidence the challenging party must demonstrate how the court found the facts from the evidence and then explain why those findings contradict the clear weight of the evidence. *Oneida,* 872 P.2d at 1054.

¶ 79 The purpose of this rigorous and strict requirement is to promote two interrelated court objectives: efficiency and fairness. *Id.* at 1053. A proper marshaling of the evidence promotes efficiency by avoid-

ing "retrying the facts" and by assisting the appellate court in its "decision-making and opinion writing." *Id.* It promotes fairness by requiring that the appellants bear the expense and time of marshaling the evidence rather than putting the appellee in the "precarious position" of performing the appellant's work at "considerable time and expense." *Id.* at 1053–54. This deference to a trial court's findings is "based on and fosters the principle that appellants rather than appellees bear the greater burden on appeal." *Id.* at 1053.

¶ 80 If the marshaling requirement is not met, the appellate court has grounds to affirm the court's findings on that basis alone. *Wilson Supply*, 2002 UT 94 at ¶ 26, 54 P.3d 1177. If appellants have failed to properly marshal the evidence, we assume that the evidence supports the trial court's findings. *Utah Med. Prods.*, 958 P.2d at 233.

2. Defendants' Failure To Marshal in Relation To Their Claims Regarding the Preliminary Injunction [14]

¶ 81 Both of defendants' claims regarding the propriety and scope of the preliminary injunction, regardless of the initial trappings,

involve the application of a highly fact-sensitive legal standard.[15] Because of the factually sensitive nature of a court's decision to enter a preliminary injunction, to properly challenge such an order an appellant must "set forth findings of fact ... [which] shall not be set aside unless clearly erroneous." Utah R. Civ. P. 52(a). As we have discussed extensively, in order to show that these findings of fact are clearly erroneous, an appellant is required to marshal the evidence in support of the findings and show that they are against the clear weight of this evidence. *Utah Med. Prods.*, 958 P.2d at 232.

 ¶ 82 Defendants claim that there is "no evidence" supporting the trial court's findings. Their assertion, however, does not satisfy the marshaling requirements. In situations where there is virtually nothing in the record that would support the trial court's findings, a claim of no evidence might be sufficient. However, an appellee need only point to a scintilla of evidence that supports a court's findings in order to refute an appellant's claim of no evidence. *Wilson Supply*, 2002 UT 94 at ¶ 22, 54 P.3d 1177. Here, plaintiffs have met and surpassed that burden. They identify several of the trial

**14.** Defendant's failure to marshal equally affects their claims regarding waiver and the appointment of the interim CEO. As discussed above, waiver is a highly fact-sensitive issue, *U.S. Realty 86 Assoc. v. Sec. Inv.*, 2002 UT 14, ¶ 11, 40 P.3d 586, requiring defendants to challenge the factual findings that led the court to its decision. *See In re Estate of Beesley*, 883 P.2d at 1347–49. Because defendants failed to marshal any of the evidence that led to the trial court's holding that they waived their right to object, we accept the findings of fact as adequately supported and find no reason to believe the trial court abused its discretion.

Similarly, the trial court's determination of the need for an interim CEO is highly factual, based largely on the exigency of the situation and availability of alternate remedies. As a result, similar to a court's appointment of a receiver, we review the appointment of the interim CEO for abuse of discretion. *See Richardson v. Ariz. Fuels Corp.*, 614 P.2d 636, 638 (Utah 1980) ("The appointment of a receiver is among those discretionary powers subject to review for abuse."). To challenge such a decision, defendants must successfully challenge the factual findings upon which the trial court's decision so heavily depended—a challenge that once again requires defendants to marshal the evidence. Defendants made no effort to marshal the evidence in order to challenge

the facts supporting the appointment of the interim CEO. Indeed, they contend that they do not need to marshal this evidence because the challenge raises only issues of law.

Although defendants waived their right to object to the appointment of the interim CEO, we could have disposed of this claim on the basis of failure to marshal the evidence.

**15.** Defendants claim that the scope of the preliminary injunction which enjoins them from competing worldwide is invalid as a matter of law due to overbreadth. However, their argument merely attempts to characterize a factual argument as a legal one. Although they argue that the scope of a preliminary injunction is purely a matter of law, each of their claims requires us to call into question the factual findings of the trial court. For example, defendants claim that E. Excel has no interest in having Madame Chen enjoined from competition with E. Excel and there was no basis for so enjoining her. They also claim that there was no evidence that Madame Chen's actions posed a threat of irreparable harm to E. Excel. Each of these challenges, however, is contrary to the trial court's findings in entering the preliminary injunction. Absent marshaling, we decline to set aside these findings.

court's findings of fact used to justify the preliminary injunction, along with citations to the record containing evidence that does indeed support these findings. These citations to the record include, among other things, detailed evidence of Madame Chen's central role in the establishment of the competing Apogee enterprise. Plaintiffs have presented more than enough evidence to persuade us that the trial court's findings were amply supported by evidence.[16]

¶ 83 Defendants have merely ignored damaging findings and avoided confronting problematic facts by claiming that there is "no evidence." They restate evidence favorable to their position, point out facts that would support findings contrary to the trial court's findings, and attempt to recast damaging evidence in a light more favorable to their position. This is essentially an attempt to reargue the facts before us. Without proper marshaling of the evidence, we refuse to set aside the ruling of the trial court or the findings upon which it is based. We have been given no reason to believe they were erroneous, and have many convincing reasons to believe they were justified.

## CONCLUSION

¶ 84 The third-party defendants, including Madame Chen and defendants Ms. Stewart and Taig Stewart, who join in this appeal, waived their right to object to the appointment of the interim CEO. Moreover, even had they not waived their right to object, the trial court possessed the equitable power to appoint the interim CEO, and we affirm its orders doing so. We also affirm the trial court's decision granting the preliminary injunction. In light of the trial court's findings of facts, and defendants' failure to properly challenge these facts through marshaling, we

hold that entry of the preliminary injunction was well within the trial court's discretion.

¶ 85 Justice PARRISH, Justice NEHRING, Judge ORME, and Judge IWASAKI concur in Chief Justice DURHAM'S opinion.

¶ 86 Having recused themselves, Associate Chief Justice WILKINS and Justice DURRANT do not participate herein; Court of Appeals Judge GREGORY K. ORME and Third District Judge GLENN K. IWASAKI sat.

---

16. Defendants' challenge of the propriety and scope of the preliminary injunction demonstrates precisely why the marshaling requirement is so important. Defendants contend that it was improper for the trial court to characterize the activities of Madame Chen and Ms. Stewart as conspiratorial. However, to determine the validity of this characterization we must go behind the trial court's factual findings regarding the conspiracy to destroy E. Excel. In order to determine whether these factual findings were against the clear weight of the evidence we would have to comb the nearly 20,000 pages of the record, assemble all the relevant evidence, identify how the trial court used this evidence to support the finding in question and determine whether this decision was clearly erroneous. This would require a colossal commitment of time and resources, a burden that the party bringing the appeal must bear. *Oneida*, 872 P.2d at 1052–53.