2011 UT App 106

**TIMPANOGOS HOSPITAL and Zurich American Insurance, Petitioners,**

v.

**LABOR COMMISSION and Tara Bishop, Respondents.**

No. 20100110–CA.

Court of Appeals of Utah.

April 7, 2011.

Eric J. Pollart, Greenwood Village, Colorado, for Petitioners.

Alan L. Hennebold, Salt Lake City, for Respondent Labor Commission.

Gary E. Atkin and K. Dawn Atkin, Salt Lake City, for Respondent Tara Bishop.

Before Judges DAVIS, ORME, and THORNE.

## MEMORANDUM DECISION

DAVIS, Presiding Judge:

¶ 1 Petitioners Timpanogos Hospital and Zurich American Insurance (collectively, Timpanogos) seek review of the Labor Commission's (the Commission) decision affirming the administrative law judge's (ALJ) order awarding temporary total disability payments to Tara Bishop. We affirm.

### I. Referral to a Medical Panel

¶ 2 Timpanogos first argues that the ALJ should have referred the case to a medical panel. The Utah Code provides that when considering a request for disability compensation resulting from an industrial accident, an ALJ may, at his or her discretion, refer medical aspects of the case to a medical panel. *See* Utah Code Ann. § 34A–2–601(1)(a) (Supp.2010). But due to rules promulgated by the Commission, there are some circumstances in which such a referral is mandatory: "A panel *will* be utilized by the [ALJ] where one or more significant medical issues may be involved. Generally a significant medical issue must be shown by conflicting medical reports." Utah Admin. Code R602–2–2(A) (emphasis added). Timpanogos argues that there were conflicting medical reports here regarding causation and that the case should therefore have been referred to a medical panel. "Whether there are conflicting medical reports is a question of fact. We must uphold the Commission's factual findings if such findings are supported by substantial evidence based upon the record as a whole." *Brown & Root Indus. Serv. v. Industrial Comm'n*, 947 P.2d 671, 677 (Utah 1997).[1]

¶ 3 The ALJ found that "[a]ll of the medical experts agreed in consensus that the events of August 19, 2002 and those subsequently related thereto caused Ms. Bishop's current medical and psychological prob-

---

1. Timpanogos argues that there existed "evidence that a reasonable person would find sufficient for a finding that there was, in fact, a conflict in medical opinion." But that is not the standard here. Rather, so long as the Commission's finding is supported by substantial evidence, we will affirm, irrespective of whether a contrary finding was possible from the evidence.

lems."[2] The ALJ noted that notwithstanding the somewhat incomplete nature of some of the medical opinions, there was no actual conflict among them: "Some of the medical experts remained within their fields and limited their opinions accordingly. Other experts rendered opinions with varying degrees of conviction about certain diagnoses without challenging the existence of the condition head on." The Commission upheld these findings, further elaborating, "The results of [Bishop's] tests for meningitis were somewhat ambiguous, resulting in equivocal diagnoses by some medical experts. However, other medical experts were unequivocal in their opinion that Ms. Bishop did, in fact, suffer from some variation of meningitis."

¶ 4 Timpanogos points to several medical opinions in support of its argument, but none of those is in actual conflict with the report of Dr. Berry, Bishop's primary care physician, that Bishop "was correctly diagnosed with Meningitis."[3] *See generally Webster's New Collegiate Dictionary* 276 (9th ed. 1986) (defining the term "conflict" as "competitive or opposing action of incompatibles"). Although Dr. Rowley, upon treating Bishop in the emergency room, noted that there was reason to believe Bishop did not have meningitis, Dr. Rowley still noted the necessity to rule out meningitis. The other statements to which Timpanogos points are likewise pre-

liminary or equivocal: Dr. Platt observed that there was "no lab confirmation at the time of discharge,"[4] Dr. Abolnik stated that there was "no clear evidence of meningitis," and Dr. Chung stated that viral meningitis "[could not] be absolutely proved or disproved based upon objective medical data."[5] Therefore we cannot say that the Commission's factual determination that there was no conflict of medical opinions is not supported by substantial evidence when considering the record as a whole.

## II. Motion To Reopen

¶ 5 Timpanogos next argues that the Commission should have granted its motion to reopen the case based on new evidence. "[T]he Commission may not arbitrarily exercise continuing jurisdiction to modify an award. The basis for reopening a claim is provided by 'evidence of some significant change or new development in the claimant's injury or proof of the previous award's inadequacy.'" *Burgess v. Siaperas Sand & Gravel*, 965 P.2d 583, 587 (Utah Ct.App.1998) (citation omitted) (quoting *Spencer v. Industrial Comm'n*, 733 P.2d 158, 161 (Utah 1987) (per curiam)), *aff'd, Ortega v. Meadow Valley Constr.*, 2000 UT 24, 996 P.2d 1039. We are not convinced that the Commission abused its discretion when it determined that the proffered evidence—Dr.

2. Interestingly, the majority of Bishop's lasting medical and psychological problems seem to have come from the procedures done to test for meningitis and the complications resulting therefrom. Regardless of whether Bishop actually contracted meningitis, these problems clearly flow from the industrial accident. It was Bishop's on-the-job exposure to meningitis that required her to seek immediate medical care and be tested for meningitis when she complained of "headache, backache and overall body ache" and when those symptoms did not quickly improve with antibiotics.

3. In its argument, Timpanogos refers to Dr. Berry's decision made early on to not treat Bishop's children because Bishop "ha[d] ruled out once already for meningitis." This referenced language is hardly a clear statement of opinion that Bishop did not have meningitis but may have referred only to Bishop's negative test results. At any rate, that comment was preliminary in nature because Dr. Berry's later and final opinion on the matter expressed certainty that meningitis was the correct diagnosis.

4. We note that there were "numerous viral labs and serologies" pending when Bishop was discharged.

5. Timpanogos also points to "MRI results, blood work and spinal tap [results]" as creating the need for referral to a medical panel. We are not convinced that test results themselves qualify as a medical opinion for the purpose of analyzing whether referral to a medical panel is required. It is conceivable that two medical professionals may interpret the same test result differently—here Dr. King stated that he disagreed with the radiologist's determination that the MRI results were normal. Further, a test may return a "negative" result simply from the fact that it was performed too early—here, the doctors decided they needed to perform a spinal tap upon Bishop's second visit to the emergency room, notwithstanding that the same test had been performed at her first visit a few days earlier.

Abolnik's deposition given in another proceeding—was "unreasonably late and too insubstantial to warrant reopening the evidentiary proceedings."

¶ 6 Timpanogos argues that Dr. Abolnik's deposition states his position that Bishop "did not have meningitis but had Rocky Mountain Spotted Fever." But Dr. Abolnik's language does not state such a definitive position but rather was, in the Commission's words, "ambiguous and equivocal":

A. I checked for that, Rocky Mountain spotted fever and Lyme. I believe in your exhibit I saw the negative test. 179 was a negative Lyme test, and—sorry, 179 was negative for Rocky Mountain spotted fever.

Actually, you know what? I'm not clear on this one.

. . . .

Q. Why are you not clear on that page?

A. On this result, because that could be a positive test.

. . . .

. . . I don't know—that looks like a positive test. . . .

. . . .

. . . It looks like this test, which I see now for the first time really, could be positive, although it seems to contradict— not necessarily contradict, because this is the IgM test, which is the acute test. So it is positive, if I understand the testing—the test presentation here correctly.

. . . .

Q. How would you go about confirming—

A. Probably repeat it.

. . . .

Q. Would it have changed your course of treatment if you'd been notified?

A. No, but I would have tried to follow her.

Q. Because Rocky Mountain spotted fever is something that you typically want to have followed by someone with an infectious disease background?

A. Not necessarily. It's just not common in this area, and I would have liked to be sure that it was indeed the case.

. . . .

. . . I want to know how frequent those things are and whether, for example, this is a true result or a false positive. So I would have repeated that lab result in the laboratories that I consider reliable and see what's there. . . . I just would have like to have known for sure.[6]

Such an equivocal statement would not affect the result in this case, and we therefore affirm the Commission's denial of the motion to reopen.

### III. Findings of Fact

¶ 7 Timpanogos also argues that the Commission acted arbitrarily and capriciously by ignoring evidence relating to medical causation and that the Commission's finding that Bishop contracted meningitis is not based on substantial evidence. *See generally* Utah Code Ann. § 63G–4–403(4) (2008) (listing situations in which an appellate court may grant relief from an agency decision, including where the agency action was "based upon a determination of fact . . . that is not supported by substantial evidence when viewed in light of the whole record before the court" or where the agency action was "arbitrary or capricious"). We disagree. First, the Commission did not ignore evidence contrary to the determination that Bishop contracted meningitis. Instead, the Commission specifically addressed such evidence in its decision and explained that ambiguous test results led to equivocal diagnoses by some doctors. Second, the finding that Bishop contracted meningitis was supported by substantial evidence. We cannot agree with Timpanogos that the opinions of three separate doctors that Bishop had some form of meningitis amounts to only a scintilla of evidence. *See generally Martinez v. Media–Paymaster Plus/Church of Jesus Christ of Latter-Day Saints*, 2007 UT 42, ¶ 35, 164 P.3d 384 ("Substantial evidence exists when the factual findings support 'more than a

---

6. Dr. Abolnik also acknowledged in his deposition that the only symptom of Rocky Mountain Spotted Fever that Bishop exhibited was her headaches and that she did not exhibit other classic symptoms.

mere scintilla of evidence ... though something less than the weight of the evidence.'" (omission in original) (quoting *Grace Drilling Co. v. Board of Review of the Indus. Comm'n,* 776 P.2d 63, 68 (Utah Ct.App. 1989))). Timpanogos's argument is essentially that more weight should have been given to the evidence in its favor, but assigning such weights is the prerogative of the Commission, *see Virgin v. Board of Review of the Indus. Comm'n,* 803 P.2d 1284, 1289 (Utah Ct.App.1990) ("As we have previously recognized, the Commission is the ultimate fact finder in workers' compensation cases. As the fact finder, the Commission may choose to give certain evidence more weight than other evidence."); *cf. Questar Pipeline Co. v. Utah State Tax Comm'n,* 850 P.2d 1175, 1178 (Utah 1993) ("While it is true that we have said that the record as a whole must be examined in determining whether findings are supported by the evidence, that does not mean that the testimony of all witnesses must be given equal weight." (citation omitted)), and we may not reweigh the evidence on appeal, *see Hurley v. Board of Review of the Indus. Comm'n,* 767 P.2d 524, 526–27 (Utah 1988) ("An agency's findings of fact ... are accorded substantial deference and will not be overturned if based on substantial evidence, even if another conclusion from the evidence is permissible."). In sum, the Commission's decision was not arbitrary or capricious and its finding regarding meningitis was supported by substantial evidence.

### IV. Constitutional Arguments

¶ 8 Timpanogos argues that its equal protection and due process rights were violated when the ALJ admitted certain medical records presented by Bishop and refused to admit a medical report presented by Timpanogos. "Constitutional issues ... are questions of law that we review for correct-

ness." *Chen v. Stewart,* 2004 UT 82, ¶ 25, 100 P.3d 1177.

¶ 9 The Equal Protection Clause of the U.S. Constitution and the uniform operation of laws provision of the Utah Constitution provide for equal protection. *See* U.S. Const. amend. XIV, § 1 ("No State shall ... deny to any person within its jurisdiction the equal protection of the laws."); Utah Const. art. I, § 24 ("All laws of a general nature shall have uniform operation.").[7] Both the uniform operation of laws provision and the Equal Protection Clause "embody the same general principle: persons similarly situated should be treated similarly, and persons in different circumstances should not be treated as if their circumstances were the same." *Gallivan v. Walker,* 2002 UT 89, ¶ 31, 54 P.3d 1069 (internal quotation marks omitted). Likewise,

> every person who brings a claim in a court or at a hearing held before an administrative agency has a due process right to receive a fair trial in front of a fair tribunal. Fairness requires not only an absence of actual bias, but endeavors to prevent even the possibility of unfairness.

*Bunnell v. Industrial Comm'n,* 740 P.2d 1331, 1333 (Utah 1987) (citation and internal quotation marks omitted).

¶ 10 We see no violation of these principles here because the parties were not similarly situated and were not treated as if their circumstances were the same; specifically, the ALJ refused to allow Timpanogos's admittedly late medical report over Bishop's objection and the ALJ allowed Bishop's timely evidence with Timpanogos's acquiescence. Contrary to Timpanogos's argument, Bishop was only required to identify the Mecham medical record in her pretrial disclosure, *see* Utah Admin. Code R602–2–1(I)(3), which she did.[8] And when she presented the evidence

7. "[E]ven though there are important areas of overlap in the concepts embodied in the two provisions, we have noted that the differences can produce different legal consequences." *Gallivan v. Walker,* 2002 UT 89, ¶ 33, 54 P.3d 1069 (internal quotation marks omitted). However, because Timpanogos has not analyzed these provisions separately in its brief, we do not address the differences between the provisions. *Cf. State v. Lafferty,* 749 P.2d 1239, 1249 (Utah 1988)

(considering only a claim under the federal constitution where the argument on appeal failed to advance a separate state constitutional analysis).

8. Although the rules provide that medical records must be produced prior to the hearing to facilitate the preparation of a medical record exhibit, *see* Utah Admin. Code R602–2–1(H), it appears that this requirement applies only to medical records of the petitioner, not to medical

at the hearing, Timpanogos specifically stated that it did not object.[9] Thus, we do not see any bias or unfair treatment by the ALJ, and Timpanogos's constitutional claims are ineffective.

¶ 11 Affirmed.

¶ 12 WE CONCUR: GREGORY K. ORME and WILLIAM A. THORNE JR., Judges.

records of a third party that may be used as evidence in the case. Furthermore, even if this rule had required the production of the Mecham medical report before the hearing, the rule also provides that "[l]ate-filed medical records may or may not be admitted at the discretion of the [ALJ] by stipulation or for good cause shown." *Id.* R602–2–1(H)(5). Considering that Timpanogos specifically stated at the hearing that it had no objection to Bishop's attempted admission of the Mecham medical record, we would find no abuse of discretion in the ALJ's decision to admit the same.

9. Timpanogos did, however, express some concern that Bishop was attempting to introduce only two pages of the Mecham medical record. The ALJ therefore ordered Bishop to provide Timpanogos with the entire medical record and told Timpanogos that it would be allowed to submit other portions of the record that it felt were relevant.