Justice LEE,
dissenting:
T 72 The legal questions in this case seem to me to yield straightforward answers requiring reversal. I see no reasonable way to read the briefing on appeal as the majority does-to suggest that the State waived its entire appeal by a single sentence in its reply brief. And if we consider the legal merits of the case, we must reverse, as the district court clearly erred in finding Debra Brown factually innocent by clear and convincing evidence.
1 73 I ean appreciate a sense of concern for the plight of Ms. Brown. She served seventeen years for a murder that she may not have committed. She has since been released from prison for almost two years on a district judge's determination that she was factually innocent. And her case on appeal presents the gut-wrenching question whether to uphold her release or reinstate a convietion that could result in her return to prison.
*503 ¶74 I acknowledge some degree of doubt as to Debra Brown's guilt, and some hesitation regarding the prudence of a decision that could result in her return to prison. But the law yields no relevance to my human sympathy for Ms. Brown or my personal doubts about her guilt, much less for any free-ranging evaluation on my part of the prudence of her incarceration status.[1] We are tasked under the law to consider a much narrower question-whether the district court erred in finding her "factually innocent" under the governing statute. And that question, for me, has a straightforward answer.
¶75 I find clear error in the district court's determination that Ms. Brown established her factual innocence by "clear and convine-ing" proof of an alibi. As far as alibis go, this is the weakest I have heard of. Ms. Brown's whereabouts are established only by her own self-interested testimony and by that of her son and boyfriend. And even accepting Ms. Brown's evidence and disregarding the State's contrary proof, Ms. Brown has not established an alibi in the sense of an indication that she could not have been at the seene of the crime at the time it was committed; quite the contrary, Ms. Brown's own evidence places her at the scene of the crime (Lael Brown's house) at the time she claims i#t was committed (Saturday afternoon). This is the opposite of an alibi. Ms. Brown did not establish her innocence based on the fact that she was "in a location other than the scene of the crime at the relevant time," Buack's Law Dictionary 84 (9th ed. 2009) (defining "alibi"); she demonstrated the opposite-that she was present at the seene of the crime at the time of the murder.
T76 Granted, Ms. Brown denied that she committed the murder and insisted that she was visiting Mr. Brown to deliver him chicken soup. But that is not an alibi; nor is it the kind of demonstration (much less a "clear and convincing" one) required by statute-that Ms. Brown "did not engage in the conduct" for which she was convicted. Instead of an alibi, Ms. Brown's case was an attempt at a do-over on the trial in which she was convicted. That is not the basis for a factual innocence determination under our law. We cannot affirm that decision without distorting the law of factual innocence.
11 77 The majority seems to acknowledge as much in "recogniz[ling] the existence of evidence ... that calls into question the post-conviction court's factual findings," supra 1 63, and in resolving the case instead on the basis of a supposed concession in the State's brief. I dissent on that point too. I see no reasonable way to read the State's briefs to concede away the whole case through an isolated statement in its reply brief. In context, the State's indication that it was not challenging post-conviction court's "factual" findings is a narrow concession. If we read that concession fairly in context, it would not encompass the two critical determinations identified by the court-that (a) Lael Brown was alive Saturday afternoon on November 6, 1993, and (b) Ms. Brown's whereabouts from Saturday afternoon on November 6 to the early morning hours of Sunday, November 7, were firmly established. In fact, the State contested both points at length throughout *504 its briefs, and clarified at oral argument that it was not conceding them (a point acknowledged even by counsel for Ms. Brown). In any event, at a minimum it is clear that the State at least challenged the probity of Ms. Brown's alibi (even assuming a concession as to her whereabouts and the time of Lael Brown's death).
T78 A fair reading of the briefing thus seems to me to keep the key issues properly in play, and accordingly to require us to address the merits of the case. I would reach the merits, and I would reverse.
I
T 79 Unlike the majority, I do not read the State's demurrer of any challenge to the "post-conviction court's factual findings" as an effective waiver of its entire case. First, it seems to me that the referenced "factual findings" do not encompass the questions of whether Lael Brown was alive on Saturday afternoon or whether Debra Brown established her whereabouts through Sunday morning. Rather, in light of the context of the overall briefing in this case, of the paragraph in which the concession appears in the reply brief, and of the parties' statements at oral argument, it strikes me as clear that the State was not conceding these determinations (which the State consistently, if a bit oddly, referred to as "hybrid" findings and not "pure factual" findings)-and indeed was contesting them hotly. Thus, in this context, I would read the State's briefing as conceding only what it denominated "pure" findings of fact-those not implicating any reweighing of evidence presented at the original trial.
180 Second, even assuming acceptance of the time of Lael Brown's death and of Debra Brown's accounts of her own whereabouts, there is no doubt that the State has not conceded the key question in the case on the merits-which is whether Ms. Brown carried her burden of proving her factual innocence by clear and convincing evidence. At a bare minimum, the State has clearly challenged the viability of Ms. Brown's alibi. Thus, even accepting that Mr. Brown was alive on Saturday afternoon and that Ms. Brown accounted for her whereabouts until Sunday morning, the State has contended that Ms. Brown still has no clear and convincing alibi-because, after all, she placed herself at the scene of the crime at a time when the murder may have happened.
A
1 81 Any suggestion that the State was not contesting the timing of Lael Brown's death or Debra Brown's account of her whereabouts is impossible to square with the overall substance of the State's briefing, with the specific context of the State's concession in its reply brief, and with both parties' statements at oral argument on appeal. The contrary grounds articulated by the majority, moreover, are unpersuasive.
1
{82 The State's challenges to the determination that Lael Brown was alive on Saturday afternoon were extensive. In its opening brief, the State argued that even though Hall's testimony indicated he had seen Lael Brown alive on Saturday afternoon, there was substantial evidence to the contrary, such that a "juror could reasonably conclude that Hall was mistaken about seeing Lael Brown on that afternoon of Saturday, 6 November 1993." [State's Brief, 48-49.]
183 The State enumerated extensive grounds supporting this conclusion. Those grounds included the following: (1) "Injone of the waitresses who worked at Angie's on that Saturday recalled seeing Lael that day" even though "Lael was not just a regular customer" and "visited Angie's like clockwork"; (2) "Lael did not answer numerous phone calls from his granddaughter and Clara on Saturday, even though Clara routinely called on Saturday mornings"; (8) "Lael's truck was in his driveway from at least 10 am. to 4:80 p.m."; (4) "Lael never returned on Saturday to complete the plumbing repairs [he had started the night before], despite his promise to do so"; (5) "[tlhe man that Hall allegedly saw with Lael has never come forward to confirm that he was with Lael on that Saturday afternoon"; (6) "Lael's neighbor ... was outside during that time and never saw Lael come or go or follow his usual practice of puttering around his yard"; and (7) "Lael *505 never picked up the soup that [Ms. Brown] said she left on his porch around 2 p.m." even though he would have had to "step over the soup at least once-when returning from Angie's." [State's Brief, 48-49; see also 30-81, 35-36.] The State's brief noted that the "post-conviction court dismissed the above evidence in a footnote by positing that 'other plausible explanations, including that Lael was simply not feeling well, could also easily account for these facts," but explained that such a "theory ... does not explain why he nevertheless felt well enough to go to Angie's in the earlier afternoon." Thus, the State argued, even if the "post-conviction court's conclusion [was] a reasonable [one], it [was] not the only reasonable conclusion to be drawn from the evidence." [State's Brief, 49.]
4 84 The State's challenges to Ms. Brown's whereabouts were also extensive. In several places in its opening brief, the State identified numerous grounds challenging Ms. Brown's evidence, [State's Brief, 80-81, 35-36, 58-54] such as its argument that "two independent witnesses contradicted [Ms. Brown's] account that she was at her son's basketball game from 10:45 am. to 12:15 p.m." [State's Brief, 58.] The State's opening brief summarized: "The evidence thus still supports a reasonable conclusion that [Ms. Brown] had the opportunity to murder Lael, notwithstanding [Delwin] Hall's testimony." [State's Brief, 52-54.]
{ 85 Elsewhere, the State notes that even if Hall's testimony is accepted at face value, "it still does not demonstrate [Ms. Brown's] factual innocence" because "[gliven the substantial evidence that incriminated [her] a reasonable juror could still find that she murdered Lael sometime after Hall allegedly saw him." [State's Brief, 52.] Thus, the State explained, "[a] reasonable juror could ... disagree with the post-conviction court's conclusion 'that [Ms. Brown's] whereabouts from Saturday afternoon on November 6th to the early morning hours of Sunday, November Tth have been firmly established."" [State's Brief, 52-54.]
186 In light of the foregoing, the State went on to summarize additional evidence that might cause a juror to doubt the post-conviction court's conclusion. The State noted, for example, that it was Ms. Brown's boyfriend and son who "corroborated parts of [her] account of her whereabouts," and that because both had close relationships to Ms. Brown "both had a motive to lie for her." [State's Brief, 58.1] Moreover, the State indicated that it is significant that "Buttars [Ms. Brown's son}-who perjured himself at trial-provided the only corroboration of her claim that she arrived home shortly after midnight on Sunday morning," [State's Reply Brief, 1], because "[alecording to the medical examiner, [Ms. Brown] could have killed Lael anytime before 3 a.m. Sunday morning," such that "even if she did not murder Lael early Saturday morning, a reasonable juror could still find that she murdered him late Saturday night or early Sunday morning." [State's Brief, 52-54.]
T 87 The above leaves no question that the State was challenging-and not conceding-the two "critical" factual determinations identified by the court, supra T 55, and of course the ultimate determination of Ms. Brown's factual innocence. Yet instead of crediting the substance of the State's arguments, the majority deems them waived by a single sentence in the State's reply brief-the one indicating that the State was not challenging the district court's "factual" determinations. The court's inference is more than a stretch. In the face of extensive factual arguments in the State's briefing, we should be loath to conclude that the State abandoned the essence of its case in one sentence of its reply brief.
2
[ 88 The majority acknowledges an "incon-sisten[ey]" between the State's "concession" that it contests no factual issues and its arguments "attack[ing] the underlying evidence on which the court relied in making these factual findings." Supra ¶¶ 62-63. Any apparent inconsistency, however, disappears upon consideration of the broader context of the briefing on appeal. That context reveals that the State was not at all conceding the "key" determinations discussed by the majority (which the State denominated as "hybrid" determinations), but was instead *506 just waiving any objection to the district court's evaluation of issues such as witness credibility (which the State referred to as "pure" factual findings).
{ 89 The concession in question appears in a section of the reply brief in which the State is addressing the applicable standard of review. In acknowledging that "clear error" is the standard that applies to factual determinations, the State sought to distinguish "pure" and "hybrid" questions of fact, insisting that the "clear error" standard "applies only when a court reviews purely factual questions." [State's Reply Brief, 15-16 (emphasis added).] Because the State's briefing does not challenge any factual findings denominated by the State as "pure" (such as credibility of witnesses at the factual innocence hearing), it was thus able to insist that the clear error standard was inapplicable. And that was the precise context of the concesgion given such a broad reading by the majority. In the sentence immediately following the distinction between "pure" and "hybrid" questions of fact, the State indicates that "[the clear error standard does not apply in this case because the State is mot challenging any of the post-conviction court's factual findings." [State's Reply Brief, 16.]
T 90 In context, it is impossible to read this sentence fairly to encompass the "key" determinations of the timing of Mr. Brown's death and the whereabouts of Ms. Brown. The distinction that preceded it had just clarified that the State's case on appeal was all about so-called "hybrid" questions (those implicating reweighing of evidence presented at the initial trial, such as the timing of Mr. Brown's death and the whereabouts of Ms. Brown) and not at all about "pure" questions (those not implicating reweighing of evidence presented at trial).
T 91 The headings and content of the reply brief confirm this reading. While the concession appears in a section captioned "Applicable standard of review," [State's Reply Brief, 15-18], the brief includes a separate section challenging the "key" determinations supposedly conceded by the State in a section captioned "Evidence at the reopened hearing." [State's Reply Brief, 18-22.] And the content of this subsection makes clear that the State's earlier "concession" does not cover these two determinations.
€ 92 In discussing the conclusion that Lael was alive on Saturday afternoon, the State's reply brief notes that the "post-conviction court's determination" on that seore "hinged entirely on Del Hall's testimony," while asserting that "Hall's testimony did not clearly and convincingly establish [Ms. Brown's] factual innocence, because substantial evidence, detailed in the State's Opening Brief, contradicted Hall's assertion that he saw Lael at Angie's on Saturday afternoon," such that "a reasonable juror could have easily found that Hall was mistaken about seeing Lael at Angie's." [State's Reply Brief, 19.] Similarly, in addressing the argument that Ms. Brown's whereabouts had been adequately established, the State notes that "the only evi-denee of her whereabouts came from herself, her boyfriend-Brent Skabelund, and her son-Ryan Buttars. Both Skabelund and Buttars had a motive to lie for [her]. Indeed Buttars perjured himself for [Ms. Brown] by falsely testifying at trial that he saw Lael write a $1000 check to [her] that [she] now admits she forged." [State's Reply Brief, 20.]
T 93 Thus, the context of the "concession" forecloses the broad reading that the majority gives it. The State was not at all rescinding the essence of its case; it was simply positing a difference between the issues it was pressing ("hybrid") and those it was not ("pure" questions of fact).
8
T 94 Any doubt on this seore was completely resolved at oral argument in this court. There, in response to the court's questions about the scope of the State's concession, counsel explained that the State meant only to waive any challenge to the district court's "pure" factual determinations-which it viewed as encompassing only those determinations made by the trial court based solely on evidence it heard directly. Oral Argument, September 4, 2012, at 5:46-6:44, 13:28-13:51. As the State explained, such findings would include a determination that a particular witness (e.g., Del Hall) was credible. *507 Oral Argument, September 4, 2012 at T:59-8:17.
T 95 The State proceeded to clarify that it was, of course, challenging "hybrid" factual determinations, which in its view depended on re-weighing of evidence presented in the prior trial. Oral Argument, September 4, 2012, at 6:20-6:42, 6:57-7:06; 14:25-14:80, 15:49-16:15. In this case, hybrid findings were expressly explained to include the district court's determinations that (1) Lael Brown was alive Saturday afternoon and (2) Ms. Brown had firmly established her whereabouts for all periods during which the murder might have occurred. Oral Argument, September 4, 2012, at 5:46-6:42, T:81-T:58, 13:28-18:52, 14:25-14:88.
196 Upon direct questioning, the State's counsel emphasized that the State was challenging these findings. When asked whether the State was "challenging those [two] subsidiary determinations by the district court," counsel replied that "[wle are saying they are incorrect and are not pure factual findings." Oral Argument, September 4, 2012, at 7:07-7:40; see also id. at 13:28-18:51 (reaffirming that the State was challenging these findings).
T 97 Counsel for Ms. Brown indicated the same understanding. When asked specifically whether the State was conceding the "determination with respect to whether Lael Brown was alive during the afternoon," Ms. Brown's counsel candidly indicated that "they are not conceding that point at all. I think they are challenging that factual determination by the district court." Oral Argument, September 4, 2012, at 21:56-28:10. Similarly, when asked whether he believed the State had conceded the determination that Ms. Brown had adequately accounted for her whereabouts, her counsel said "they don't concede that." Oral Argument, September 4, 2012, at 21:56-23:10.
1 98 Thus, the context of the State's briefing made its reply brief concession clear to both sides. Everyone understood that in context, the State intended only to waive objection to what it characterized as "pure" findings of fact. Everyone understood that the matters argued at length in the State's brief-regarding the timing of Mr. Brown's death and the whereabouts of Ms. Brown up until then-were matters pressed on appeal to this court.
199 This holds regardless of the viability of the State's distinction between "hybrid" and "pure" factual findings. I agree with the majority's rejection of that distinction. Empirical questions are questions of fact, see Manzanares v. Byington (In re Adoption of Baby B.), 2012 UT 35, ¶ 40, 308 P.3d 382, 2012 WL 4486225, and all such questions are subject to review for clear error. I see no room in our law, in other words, for any distinction between "hybrid" and "pure" questions of fact.[2] But the question before us is not whether to accept the State's proposed distinction. It is how to construe the concession in its reply brief-the sentence indicating that it was not "challenging any of the post-conviction court's factual findings." And in light of the State's proposed distinction-as set forth in the briefs, and as understood by both sides at oral argument-there is no question as to what the State meant when it waived any challenge to the lower court's findings of fact. It used that term in a narrow, limited sense-a sense that avoids the "inconsistency" acknowledged by the court and that avoids the puzzling inference of an intent by the State to stipulate away the entirety of its case on appeal.
*508 4
1100 Notwithstanding the above, the majority still deems the State to have forfeited any effective challenge to the district court's factual innocence determination. It roots that conclusion in part in "the way in which the State has briefed its case" on appeal-specifically, in its purported failure to "marshal the evidence" supporting the district court's findings and in not pressing its challenge to the district court's decision in terms of a "clear error analysis." Supra ¶ 66. I read the State's briefing differently. I think the State has effectively marshaled the contrary evidence in the record. And although the State has not employed the terminology of "clear error," it seems to me that the substance of its argument effectively challenges the district court's decision on that basis. In any event, in my view any rhetorical deficiency in the briefing is understandable and ought to be overlooked in light of the complex, first-impression nature of the issues presented for our review.
(a)
101 We should not fault the State for a failure to marshal because Ms. Brown never asked us to do so, and the State accordingly has had no opportunity to explain itself. Absent such explanation, we are in no position to assess the degree to which the State has carried any burden to marshal. Indeed, a sua sponte marshaling dismissal would turn the rationale for the marshaling rule on its head, as an independent assessment of a party's compliance with the rule would require exactly what the rule is designed to prevent-an investment of the court's time in digging through the record. See Chen v. Stewart, 2004 UT 82, ¶ 79, 100 P.3d 1177 (citing judicial economy considerations in support of the marshaling rule).
1102 Having done just that, I would conclude that the State's briefs are sufficient. They appear to me to effectively comply with our marshaling rule by presenting substantial discussion and meaningful analysis of the evidence supporting each of the findings at issue on appeal.
(I)
1103 In disputing that Lael was alive on Saturday afternoon, see supra ¶¶ 82-83, the State's opening brief extensively discusses the evidence supporting the trial court's determination that he was. This includes discussion and explanation of the following evidence: (1) the "medical examiner testified that the physical findings 'were most consistent or most typical of a time of death around 9 pm. on Saturday" and that "Lael likely died around 9:15 p.m. on Saturday, 6 November 1993, and no later than 3 a.m. on Sunday, 7 November"; [State's Brief, 20.] (2) Stand-ridge, Lael Brown's neighbor, was painting outside her home "between 10 a.m. and 4:80 pm. that Saturday" and "did not hear any gunshots" even though she "could hear Lael's phone ringing"; [State's Brief, 7.] (8) another neighbor, Paulette Nyman, now believed "she heard the shots on the same day that she saw police activity at Lael's home, which would have been Sunday"; [State's Brief, 21.1 (4) the police had received tips from two people-Delwin Hall and an unnamed secretary at Cache Valley insurance-who said they saw Lael on Saturday afternoon, and the police may have disregarded these tips; [State's Brief, 19, 25.] (5) an officer had testified at the evidentiary hearing that he "vaguely recalled one of Lael's neighbors telling him that she heard shots on Saturday night"; [State's Brief, 21.] (6) "(al few days after the murder, Hall told police ... he had seen Lael having coffee at Angie's on Saturday" and gave a written statement to a police officer stating that he was a "friend/coffee drinking buddy of Lael's" and that he saw Lael "Saturday, 11-6-98 at approx. 1480 hours in Angie[']s," a time he was "sure of ... because he was stopping at Angie's before going to work at Albertsons at 1500 hours"; [State's Brief, 25-27.] (7) Ms. Brown's counsel "called Delwin Hall to testify about his tip to police" at the PCRA hearing and he continued to maintain-at the PCRA hearing-that "at the time [he] was quite sure that it was on a Saturday that [he] saw him"[3] [State's Brief, 25-27.] (8) Del-win Hall did not know and had never spoken to Ms. Brown; [State's Brief, 25-27.] (9) *509 Terry Carlsen, who knew Lael and said he was Lael's "good friend[ ]" testified he was "certain" "that on Saturday he saw Lael and Mike Brown [Lael's son] at Angie's around 7:15 p.m.," where they stayed for a "half hour and left around 7:45 p.m." and that "Carlsen said he learned of Lael's death on Sunday and was surprised to think that he had just seen Lael the night before"; [State's Brief, 27.] (10) even though Mike Brown, Lael's son, testified he was not with his father at any time on Saturday, "he had memory problems during 19983-1994 from alcoholism"; [State's Brief, 27-28.] (11) one waitress, Holly Crockett, who had worked from 8 to 11 p.m. on Saturday, November 6, testified that "she thought she saw Lael on Saturday night"; (12) none of the statements given by Angie's waitresses-indicating that they had not seen Lael on Saturday-were inconsistent with Hall's testimony; [State's Brief, 31-82.] and (18) Lael Brown may have not been feeling well on Saturday, leading him to "not have kept his morning coffee ritual, answered his ex-wife's and granddaughter's telephone calls, worked in his yard, driven his truck, kept his promised appointment to complete the plumbing repairs, or picked up [Ms. Brown's] soup from the porch." [State's Brief, 82.]
()
104 Similarly, in arguing that Ms. Brown could not adequately account for her whereabouts during all times when the murder might have occurred, supra 1984-86, the State presented substantial discussion and explanation of evidence that supported the trial court's determination that she could. This included the following evidence: (1) Ms. Brown had explained her whereabouts for all time periods during which the murder might have occurred;[4] [State's Brief, 21-28.] (2) Standridge, Lael's neighbor, was painting outside her home "between 10 a.m. and 4:30 po. that Saturday" but never heard any *510 gunshots, even though she heard Lael's phone ringing several times during that period; [State's Brief, 7.] (3) Paulette Nyman, another neighbor, who had originally told police that she heard shots on Saturday, said she may have actually heard the shots on Sunday morning; [State's Brief, 5.] (4) Ms. Brown had taken and passed a polygraph in which she was asked whether she had killed Lael; [State's Brief, 20.] (5) Ms. Brown "presented police tip sheets in which people near Lael's home reported hearing gunshots at times other than around 7 a.m. on Saturday, November 6th"; [State's Brief, 21.] (6) in a direct appeal from her conviction, this court stated that Ms. Brown "could account for her whereabouts for the entire weekend except for early Saturday morning; [State's Brief, 82883.] (7) the trial court believed that "no evidence was presented to suggest that [Ms. Brown's] account of [her] whereabouts [was] inaccurate" and although she may have been alone at times "no evidence [was] ever presented establishing that Lael was killed during the time period she was by herself"; [State's Brief, 88.] and (8) Ms. Brown had testified she returned to Lael's house on Sunday, found the chicken soup on the porch in the "identical" spot and, upon discovering that Lael was cold, "ran from the house yelling for help" before "return{ing] to the house and call{ing] 911." [State's Brief, 9.]
(b)
105 The majority's objection to the above is its conclusion that it is merely a "list" of "evidence relied on by the post-conviction court" that does not "assume the role of devil's advocate." Supra ¶ 66. Because the latter role is one the court deems essential, it finds the State's briefing "consistent" with the inference that it is "not challenging the court's factual findings." Supra ¶ 66.
T{106 Both the premise and the ensuing inference strike me as problematic. As for the premise (that marshaling requires devil's advocacy), I see nothing in our rule that requires a lawyer to abandon his usual role of zealous advocacy. See Urax R. ProFruL Conpucr 1.3, emt. [1]. And I confess that I have no idea what the notion of devil's advocacy entails in practice. We have sometimes said that it requires counsel to "temporarily remove [their] own prejudices and fully embrace the adversary's position," Chen, 2004 UT 82, ¶ 78, 100 P.3d 1177 (internal quotation marks omitted), but I see no way to apply that standard in a predictable, judicially-manageable way. Given that it finds no basis in our rule, and in light of the significant consequences at stake (dismissal without reaching the merits), I would abandon this prineiple. It is a trap for the unwary, and a tool for arbitrary judicial decision making.[5]
107 I would likewise reject the inference the majority draws from the State's briefing. Under the cireumstances, I see no basis for treating the State's failure to play "devil's advocate" as an indication of an intent to *511 waive the crux of its case on appeal. Instead, I would attribute it to the State's attempt to distinguish "pure" and "hybrid" facts. Under rule 24(a)(9) of the Utah Rules of Appellate Procedure, marshaling of "ree-ord evidence that supports [a] challenged finding" is required only where a party is challenging a "fact finding." [6] And because the State believed that there was a legally significant distinction between "pure" and "hybrid" factual determinations, it seems to have read this marshaling requirement as applying only to "pure" findings of fact made by the judge in the first instance, not "hybrid" determinations based in part on review of a cold paper record from a prior case.[7] That would explain why it expressly announced that it was "recit[ing] all the evidence produced at the factual innocence hearing that both supports and undercuts [Ms. Brown's] claims.[8] [State's Brief, 18 n. 7 (emphasis added).]
(c)
1108 Nor do I see a basis for any inference to be drawn from the State's failure to phrase its challenge to the district court's findings in terms of "clear error." Supra 167 n. 61. The State's rhetorical tack followed naturally from the proposed pure/hybrid distinction. It deemed only the former subject to review for clear error, and thus framed its challenges to what it viewed as "hybrid" determinations in other terms. Again, I disagree with this distinction. But the point is that it explains-and in my view exeuses-any rhetorical flaw in the State's briefing.[9]
1 109 As the majority indicates, the State's challenges to the district court's findings are sometimes phrased in terms asserting that the court's decision was "not the only reasonable conclusion" that could be drawn from the evidence. Supro ¶ 67 n. 61 (internal quotation marks and emphasis omitted). But I would not read that formulation as a waiver of a challenge to the district court's findings-or even as incompatible with the applicable standard of review. This is hardly the first time an appellant has filed a brief in our *512 court exhibiting confusion or even outright error as to the applicable standard of review. Our typical response is the one we should invoke here-to articulate the correct standard of review, and then to proceed to assess the appellant's position under that standard.
T110 In this case, moreover, the State's confusion is understandable in light of the inherent tension-and interplay-between the strict standard of proof applicable at the district court level (requiring proof of factual innocence by "clear and convincing evidence") and the lenient standard of review that governs on appeal (calling for deference to the district court's determination absent a showing of "clear error")[10] Proof by clear and convincing evidence is hard to come by. "[F]or a matter to be clear and convincing to a particular mind it must at least have reached the point where there remains mo serious or substantial doubt as to the correctness of the conclusion." Sine v. Harper, 118 Utah 415, 222 P.2d 571, 581-82 (1950) (emphasis added) (internal quotation marks omitted). So it is understandable that the State's briefing would seek to invoke and apply this high standard of proof-which does appropriately temper the otherwise high, clear error standard of review-by repeatedly asserting that the district court's determinations were "not the only reasonable conclusion[s]" that could be drawn from the evidence, supra ¶ 67 n. 61 (internal quotation marks and emphasis omitted).[11] And in light of the interrelationship between the standard of review and burden of proof, it seems clear to me that these assertions should be viewed as advancing the State's argument that there is "serious or substantial doubt as to the correctness" of the district court's conclusions, and thus that reversal is in order in light of Ms. Brown's failure to carry her burden of proving factual innocence by clear and convincing evidence."[12]
{111 The State should also have framed this argument in terms of the applicable standard of appellate review. It should have asserted that there was "clear error" in not concluding that Ms. Brown had failed to remove all "serious or substantial doubt" as to her factual innocence.[13] But the absence of that verbiage seems quite inconsequential-certainly not enough to justify avoiding the merits in a case of this consequence, particu *513 larly in a case implicating complex questions of first impression.
(d)
" 112 These matters of first impression are manifold. They include whether the factual innocence determination must rest exclusive ly on entirely new evidence; whether so-called "hybrid" questions are subject to a less deferential standard of review; and how the "clear and convincing" standard of proof affects the appellate standard of review.
1 113 In light of these questions, I would at least acknowledge room for doubt about the propriety of the methodology of the State's case on appeal. And I would give the parties the benefit of any doubt on the matter-in a manner preserving our ability to reach the merits. On a first-impression question of this complexity, we should tread lightly. We should not foreclose a review of the merits on the basis of our disagreement with the terms or methodology of the parties' briefing. I would accordingly conclude that the State effectively challenged the district court's determinations regarding the timing of Lael Brown's death and regarding Ms. Brown's account of her whereabouts.
B
T114 Even assuming, however, that the State had accepted these determinations, there is still another sense in which the State's position on the merits is properly before us on appeal. At a minimum, the State has challenged the viability of Ms. Brown's alibi. It has done so by noting that even according to Ms. Brown's own evidence, she was at the scene of the crime at a time when the murder may have been committed. In particular, the State argued that Ms. Brown's evidence did not "affirmatively show" what her evidence was required to show-"that she did not kill Lael Brown at any time"-because her evidence "still supported] a reasonable conclusion that [she] had the opportunity to murder Lael." [State's Brief, 52-58.] And as explained in greater detail in the merits discussion below, that is enough to preserve the crucial issue before us on appeal-and, in fact, to require reversal on the merits.
115 That conclusion is not at all undermined by the district court's "credibility findings." Supra ¶69. The credibility of Debra Brown's account of her whereabouts can be accepted without undermining the State's case on appeal. Because Ms. Brown placed herself at the scene of the crime, it matters not that her credibility "would presumably qualify as [an] unchallenged 'pure' fact[ ].[14] Supra ¶ 69. Her account of her whereabouts can be accepted as credible-and perfectly accurate-as its timing does not at all rule herself out as Lael Brown's murderer.[15]
*514 {116 There is of course one aspect of Debra Brown's testimony that must be understood to be in question in order for us to reach the merits of the case on appeal, and that is her ultimate denial of the charge of killing Lael Brown. But surely even the majority does not read the State's briefs to concede her credibility on that point (since acceptance of her denial would defeat any basis for an appeal). In fact, the State's briefing makes this point directly. Despite recognizing that Debra Brown "testified that she did not murder Lael Brown and that she did not know who did," [State's Brief, 24.] the State nonetheless asserts that "[the Legislature could not have intended that a petitioner could establish her factual innocence merely by testifying that she is innocent." [State's Brief, 43.][16] So at least to that extent, even the majority must understand the State to be challenging Debra Brown's credibility. And on that question, we cannot possibly conclude that she carried her burden of establishing her factual innocence by clear and convincing evidence.
T117 In asserting her factual innocence, Ms. Brown has insisted that although she was at the seene of the crime at a time when the murder could have been committed, she simply didn't do it. If that is clear and convincing proof of factual innocence, our courts will be inundated with (presumptively meritorious) factual innocence petitions. So, on the narrow point of "credibility" that is obviously in question, the district court's credibility determination should be reversed as clearly erroneous.[17]
*515 118 I would thus read the State's briefs to properly preserve an analysis of the merits of the district court's factual innocence determination even assuming acceptance by the State of the district court's findings regarding the timing of Lael Brown's death and regarding Debra Brown's accounts of her whereabouts.
II
T119 We should accordingly reach the merits of the State's challenge to the district court's determination that Ms. Brown met her burden of proving her factual innocence. I would do so under the clear error standard of review, and would reverse.
1120 As the majority notes, the determination of factual innocence in this case was premised on two subsidiary factual findings: (1) that "Lael Brown was alive Saturday afternoon," and (2) that "[Ms. Brown's] whereabouts from Saturday afternoon on November 6th to the early morning hours of Sunday, November 7th, hald] been firmly established." Supra ¶ 55 (first alteration in original) (internal quotation marks omitted). And because those questions are factual ones-given that they "entail[ ] the empirical, such as things, events, actions, or conditions happening, existing, or taking place"-they are reviewed for clear error. See Manzanares v. Byington (In re Adoption of Baby B.), 2012 UT 35, ¶ 40, 308 P.3d 382 (alteration in original) (internal quotation marks omitted).
{121 And in my view the State has easily carried its burden on appeal. I would conclude that the trial court clearly erred in making at least one, and perhaps both, of the subsidiary factual determinations on which its finding of factual innocence rested.[18]
B
122 The first of these determinations-that Ms. Brown proved by clear and convine-ing evidence that Lael Brown was alive at some point on Saturday afternoon-is not incontrovertible. Supro ¶ 82-83. Despite some doubts, however, I see the propriety of that finding to be a close issue. The propriety of the second determination, however, is not such a close call. It is obvious that the trial court clearly erred by determining that Ms. Brown had-by clear and convincing evidence-conclusively established an alibi during the relevant time period (the period during which the murder could have occurred).
1 123 That relevant time period-according to the trial court-was "10:00 a.m. on Saturday afternoon until Sunday morning at 3:00 a.m." The trial court noted that Ms. Brown had given the following explanation of her whereabouts during the time:
At approximately 10:00 a.m. on Saturday, [Ms. Brown's] son Ryan Buttars saw his mother when he awoke. Shortly thereafter, at approximately 10:20 a.m., Brent Skabelund, who was [Ms. Brown's] boyfriend at the time, arrived at her home to accompany her to her son's basketball game at Skyview High School in Smith-field. They left for the game at approximately 10:40 or 10:45 a.m. From 11:00 a.m. to 12:15 p.m., [Ms. Brown] and Skabelund watched the basketball game. Following the game, she and Skabelund stopped at R&G's, a local drive-in, for lunch. After lunch, Skabelund took her to her house where she took a nap. Between 2:00 and 3:00 p.m. [she] delivered chicken soup to Lael's house, possibly her daughter's house as well, and then went to a new store at the Pine Crest shopping area. She then went back home and called Skabelund around 4:00 p.m. At 4:80 p.m., Skabelund *516 drove to [Ms. Brown's] home, and together they went shopping at Macey's grocery store. They then went back to [Ms. Brown's] home to put away the groceries at approximately 5:40 p.m. and had pizza for dinner that [her] sons brought home. Skabelund stayed at [Ms. Brown's] resi-denee until 6:45 p.m., and then they both drove to Skabelund's house to watch movies. They arrived there around 7:00 p.m. [Ms. Brown] fell asleep at 8:00 or 8:80 p.m. while she was watching the movie and slept until midnight. At midnight she awoke and drove herself home. After arriving home she saw her two sons who were playing video games. [She] went to bed shortly after midnight Sunday morning. Buttars indicated that his mother stayed at home the rest of the night.
{124 Based on the foregoing chronology, and because in its view "[nlo evidence was presented to suggest that [this] account of [Ms. Brown's] whereabouts [was] inaceu-rate," the trial court ultimately found by "clear and convincing evidence that [Ms. Brown's] whereabouts from Saturday afternoon on November 6th to the early morning hours of Sunday, November 7th, hald] been firmly established," such that "she could not have killed Lael during the" relevant time period "when the murder could have occurred."
1125 This is clear error. The consideration of Ms. Brown's whereabouts is relevant only as part of her "alibi." And even assuming arguendo that Lael Brown was alive for some portion of the afternoon,[19] Ms. Brown still lacks a plausible-let alone a compelling-alibi.
€126 An "alibi" is "[a] defense based on the physical impossibility of a defendant's guilt" because the "defendant [was] in a location other than the seene of the crime at the relevant time." Buack's Law Dictionary 84 (9th ed. 2009). Ms. Brown's "defense" comes nowhere close. First, her establishment of her whereabouts in no way demonstrates "impossibility." Unlike the classic alibi involving indisputable, objective evidence of the suspect's whereabouts, Ms. Brown's evidence was subjective and self-serving.[20] The witnesses who vouched for her whereabouts during critical portions of the day were all close friends or family members-people who had a significant motive to lie for her, supra 1 86.[21]
127 More fundamentally, during at least the "chicken soup" trip, and perhaps during other times, she was completely alone and, worse, by her own admission, at the scene of the crime. This is no alibi. It is only a self-serving explanation for why she was at the seene of the crime (ie., delivering chicken soup) and thus constitutes no more than a denial.
{128 That cannot possibly be enough to rise to the level of clear and convincing proof of factual innocence under the law. The district court's decision must accordingly be reversed; otherwise the "factual innocence" *517 bar in Utah will be set at an impossibly low level.
III
€129 The grounds on which the majority rests its decision were never asserted by Ms. Brown in her briefs or at oral argument. And the court's opinion today is thus handed down without the benefit of any input from the State through the adversary process. We owe the parties more in a case of this (or any) magnitude. We should decide this important case on its merits. And we should reverse under the law, even if that decision runs counter to the outcome seemingly dictated by our human compassion for a sympathetic party like Ms. Brown.

. It bears emphasizing that the decision before us is not whether to return Ms. Brown to prison; it is only whether to reverse a decision vacating her conviction. And upon such reversal, another body of government would still retain the discretionary authority to override any effect of reinstating Ms. Brown's conviction-to pardon Ms. Brown or commute her sentence to time served. Under our law, the Board of Pardons would retain that discretion. See Urax Cope § 77-27-5(1)(a) ("'The Board of Pardons and Parole shall determine by majority decision when and under what conditions, subject to this chapter and other laws of the state, persons committed to serve sentences in ... all felony cases except treason or impeachment ... may be released upon parole, pardoned, ordered to pay restitution, or have their fines, forfeitures, or restitution remitted, or their sentences commuted or terminated.").
If the court were to follow the law as I see it and reinstate Ms. Brown's conviction, there is no guarantee she would be returned to prison. It is also possible that she would be pardoned or that her sentence would be commuted. Whatever the likelihood of that eventuality, we must not confuse our authority with that of the Board of Pardons. That entity is charged by law to consider "when and under what conditions" individuals convicted of felonies "may be released upon parole, pardoned ... or [have] their sentences commuted or terminated," id.; this court must simply follow the law.

. That is not to say that the distinction is without logical foundation. One of the rationales for granting deference to factual determinations-that the court has a "comparative advantage in its firsthand access to factual evidence," see Manzanares v. Byington (In re Adoption of Baby B.), 2012 UT 35, ¶ 40, 308 P.3d 382-is not implicated in a case where the court is making its findings, in part, based on a cold record from a prior proceeding. Oral Argument, September 4, 2012, at 15:49-16:15. But in my view the State's proposed distinction still fails under our relevant case law, which suggests an additional rationale for reviewing factual determinations deferentially-that "there is no particular benefit in establishing settled appellate precedent" on case-specific factual questions See In re Adoption of Baby B., 2012 UT 35, ¶ 40, 308 P.3d 382. This second rationale is equally applicable to both "pure" and "hybrid" factual determinations, and thus forecloses the State's proposed distinction.

. The State notes that "[tlhe court's ruling hinged on Hall's testimony" and that "the signifi *509 cance of the evidence provided by Hall cannot be overstated" because it provided "direct evidence that Lael was alive Saturday afternoon" in contrast to the "circumstantial evidence at trial that Lael was killed Saturday morning." [State's Brief, 30.] The State also asserts:
The court found that Hall was credible and "not mistaken when he stated that he saw Lael at Angie's Restaurant during the early afternoon hours on Saturday, November 6th." The court noted that Hall gave his statement to Detective Ridler less than four days after Hall saw Lael at Angie's and "there were no intervening weekends to cause confusion." The court also found it significant that Hall told Detective Ridler he saw Lael on "Friday night as well as Saturday afternoon." The court noted that Hall had "a high degree of certainty" about his testimony and no evidence suggested that Hall was easily confused about dates or had short-term memory problems. -
[State's Brief, 30.]

. Moreover, the State's brief actually provides [Ms. Brown's] account of her whereabouts during all relevant times. This substantial discussion notes:
At the evidentiary hearing, [Ms. Brown] testified that on Saturday morning, she left Skabe-lund's home around 6 or 7 a.m., went home, bathed, and then went to the store to buy ingredients to make soup for Lael and her daughter, who was also sick. She testified that her son Ryan Buttars saw her sometime that morning. Ryan testified at trial that he could not remember when he awoke Saturday morning, but 'it was kind of late' and his mother was there when he awoke. Consistent with the trial evidence, [Ms. Brown] said that Clara Brown called her around 9:55 a.m. on Saturday morning after she could not reach Lael by phone. They talked for about twenty-seven minutes. Clara asked [Ms. Brown] to check on Lael and call her back if he was sick. Skabe-lund arrived at [Ms. Brown's] home while she was talking to Clara. [Ms. Brown] testified that she and Skabelund left around 10:40 or 10:45 a.m. to attend her son's basketball game. [She] and Skabelund testified that they stayed for the whole game. [She] did not say when the game ended, but Skabelund testified at trial that they left the game at 12:15 p.m.... [Ms. Brown] said that after the game, she and Skabelund had lunch at a drive-in and Skabe-lund took her home where she slept for a while. She said she delivered the soup to Lacl, and possibly her daughter, between 2 and 3 p.m. [Ms. Brown] claimed that although Lael's truck was there, he did not answer when she knocked. [She] said she wrote Lael a note which she left with the soup on his porch. She said she did not use her key to take the soup in because she thought that Lael might be sleeping. She also said she wanted to avoid talking with Lael because he could talk for a long time. She did not check on Lael, even though she had told Clara that she would. Rather, [Ms. Brown] returned home. Around 4:30 p.m., [Ms. Brown] and Skabelund went grocery shopping, then had dinner at [Ms. Brown's], and later watched a movie at Skabelund's. [Ms. Brown] testified that she left Skabelund around 10 or 11 p.m. and went back to her house where she slept. She believed that her *510 sons were still awake when she arrived home. At trial, Skabelund testified that [Ms. Brown] left his home around midnight Saturday night. Her son Ryan teslified at trial that she returned home 'after midnight' on Sunday, November 7.

 In an appropriate case, we should revisit and clarify our doctrine of marshaling. Our case law in this field is marked by vagaries and contradictions. We sometimes treat failures to marshal as decisive of an appeal, see, eg., United Park City Mines Co. v. Stichting Mayflower Mountain Fonds, 2006 UT 35, ¶¶ 38, 41, 140 P.3d 1200, and other times overlook such failures and proceed to the merits, see, eg., State v. Green, 2005 UT 9, ¶¶ 12-13, 108 P.3d 710. Conspicuously missing from our cases is any principled explanation for this all-important distinction. Instead of announcing any such basis, we have expressly declined to impose any limits on our ability to invoke marshaling as a basis for default on appeal, citing our purportedly limitless discretion. See Martinez v. Media-Paymaster Plus/Church of Jesus Christ of Latter-Day Saints, 2007 UT 42, ¶¶ 19-20, 164 P.3d 384 (noting that parties risk forfeiting their challenges to factual questions when they fail to marshal but sustaining the court of appeals' choice to resolve the case on its merits because [tlhe reviewing court ... retains discretion to consider independently the whole record and determine if the decision below has adequate factual support").
Under our cases as they now stand, a wary litigant would be left to discern only one real principle in our marshaling cases: We impose the sanction of default when we want to and reach the merits when we don't. Such unbridled discretion is incompatible with the judicial function. We cannot be said to be deciding cases under the rule of law where our gate keeping for appellate decision making is so haphazardly marked.

. See, e.g., Gilbert v. Utah Down Syndrome Found., Inc. (In re Discipline of Gilbert), 2012 UT 81, ¶ 14 a. 3, 301 P.3d 979 ("[Blecause the Foundation does not challenge any of the district court's factual findings, it had no marshaling obligation."); Rapela v. Green, 2012 UT 57, ¶ 12 n. 2, 289 P.3d 428 (explaining that marshaling requirement only applies where "factfual] finding[s}" are challenged (internal quotation marks omitted)).

. See In re Discipline of Sonnenreich, 2004 UT 3, ¶ 45 n. 14, 86 P.3d 712 (concluding that failing to marshal was not "dispositive" of an appeal because "the district court's bad faith finding was based primarily on memoranda submitted by the parties").

. Moreover, to the extent this statement is an assertion that the marshaling obligation extended only to evidence adduced at the PCRA hearing and not the original trial, this belief may also stem in part from the State's contention that newly discovered evidence must be the pivotal, transformative evidence in demonstrating factual innocence. After all, this type of evidence would necessarily come to light at the hearing, not at the prior trial.

. The majority ignores this distinction in asserting that I have "characterize[d] the State's approach in a way the State itself has expressly rejected." Supra ¶ 67 n. 60. Once this distinction is understood, it becomes clear that the State's purported "concession" in its reply brief does not encompass these findings-and thus that my position is not in tension with the State's briefing.
The majority's contention that the State was responding to Ms. Brown's invocation of the clear error standard-and that she subsequently applied this standard in analyzing the time of Lael Brown's death and Ms. Brown's whereabouts, supra ¶ 67 n. 60-does not undermine this conclusion. The section of the State's brief captioned "Reply to Petitioner's Point 2," in which the purported "concession" appears, makes four, distinct points. The first is that "clear error is [not] the appropriate standard of review." [State's Reply Brief, 15.] In making this point, the State expressly references page 42 of Ms. Brown's brief. This page of the brief, however, never speaks about Lael's time of death or Ms. Brown's whereabouts on the day of the crime. These issues are discussed later in the brief, [Brown's Brief, 43-48.] and, importantly, the State addresses these portions of Ms. Brown's brief in three subsequent sections of its reply brief. [State's Reply Brief, 18-22] Thus, the statement in the State's brief "that the clear error standard does not apply" was not a "direct response to Ms. Brown's application of the clear error standard in her brief" to the "two key findings regarding Lael's time of death and Ms. Brown's whereabouts." Supra ¶ 67 n. 60. Rather, it was a direct response to Debra Brown's choice to invoke this standard at all in the case.

. Other courts have observed this interplay and explained that "in applying [a] standard of review, we necessarily incorporate an understanding of the appropriate burden of proof in the district court." See Mondaca-Vega v. Holder, 718 F.3d 1075, 1084 (9th Cir. 2013) (explaining this point in applying a "clear error" standard of review to a district court's factual finding where the burden of proof was by "clear and convincing" evidence and ultimately concluding that ''the district court's key finding, that Petitioner is Salvador Mondaca-Vega, is not clearly erroneous under the 'clear and convincing' standard of proof"); Marsellus v. C.I.R., 544 F.2d 883, 885 (5th Cir.1977) (''The issue of fraud is a factual one. Thus, we may reverse the Tax Court's finding of fraud only if we find that i was 'clearly erroneous.' At the same time, we must judge the Tax Court's findings in light of the government's burden of proving section 6653(a) fraud by 'clear and convincing' evidence." (citations omitted)); Sw. Bell Tel. Co. v. Garza, 164 S.W.3d 607, 622, 627 (Tex. 2004) ("As a matter of logic, a finding that must be based on clear and convincing evidence cannot be viewed on appeal the same as one that may be sustained on a mere preponderance.... In sum, we think that whenever the standard of proof at trial is elevated, the standard of appellate review must likewise be elevai-ed." (internal quotation marks omitted)).

. The State made this point repeatedly in the argument section of its briefing. [State's Brief, 35-36, 49-50, 52.]

. This point is made clear in the State's "summary of the argument," where it explains: "[The court erred in concluding that Petitioner's evidence at the reopened hearing established her factual innocence.... Substantial evidence contradicted ... Petitioner's account of her whereabouts. Therefore, a reasonable juror hearing all of the evidence could still find Petitioner guilty. Because Petitioner's evidence did not even present a reasonable juror from still finding her guilty, that evidence necessarily failed to clearly and convincingly demonstrate Petitioner's factual innocence." [State's Brief, 35-36.]

. The State did invoke this standard in the "statement of the issues" section of its brief. There, it asserted that the second issue on appeal was whether "the post-conviction court erroneously concluded that Petitioner had demonstrated her factual innocence by clear and convincing evidence." The State asserted it had "preserved this issue ... by arguing that Petitioner did not meet her burden," and explaining that "[al post-conviction court's legal conclusions are reviewed for correctness and its factual findings for clear error." [State's Brief, 2.]

. It is, however, unclear that the State would agree with this characterization. In the first place, the State erroneously believed that # did not need to challenge Debra Brown's credibility since it believed Debra Brown's post-conviction testimony could not be relied upon in assessing her factual innocence since this testimony was not "newly discovered evidence because it [was] always available to [her] at trial." [State's Brief, 43.] The State's briefing led with and expended significant ink on this newly discovered evidence point. Its counsel also expended significant effort pressing the point at oral argument.
Moreover, the State's briefing also attacked Debra Brown's credibility repeatedly. It argued that "(al reasonable juror could ... disagree with the post-conviction court's conclusion that Petitioner's whereabouts from Saturday afternoon on November 6th to the early morning hours of Sunday November 7th, have been firmly established" because "the evidence of Petitioner's whereabouts depends on her credibility, and a reasonable juror would have good reason to doubt her credibility where she admitted to having stolen from Lael and lied about it." [State's Brief, 52.] The State also argued that the district court was incorrect in concluding that " 'no evidence was presented to suggest that [Petitioner's] account of [her] whereabouts is inaccurate" because "[the evidence at trial ... did not merely 'suggest' that Petitioner's account of her whereabouts was inaccurate; it demonstrated that her account was inaccurate," such that "a reasonable juror could still find Petitioner guilty because serious credibility concerns surround Petitioner's account of her whereabouts." [State's Brief, 53 (emphasis in original).]

. This point is underscored by the district court's initial determination-after hearing Debra Brown's testimony-that she had failed to prove her factual innocence by clear and convincing evidence. The State's brief highlighted this point as well: "As explained, the court relied on the correct legal standard when it discounted all of Petitioner's evidence at the four-day evi-dentiary hearing. In the court's view, that evidence did not even meet the lower 'no reason *514 able juror could have convicted' standard that Petitioner advocated. Rather, the court concluded that 'reasonable jurors still could have differed on what the old and new facts established and whether the prosecution could have proven its case beyond a reasonable doubt.' Because Petitioner's evidence could not even satisfy the PCRA's lesser standard, the court correctly reasoned that the evidence necessarily could not satisfy the factual innocence statute's higher standard." [State's Brief, 47.]

. The State's briefing also argues that "[gliven the substantial evidence that incriminated Petitioner, a reasonable juror could still find that she murdered Lael sometime after Hall [a witness who claimed he had seen Lael in the early afternoon on Saturday] allegedly saw him." [State's Brief, 52.] Similarly, it explained that "[slub-stantial evidence contradicted ... Petitioner's accounts of her whereabouts," such that "a reasonable juror hearing all of the evidence could still find Petitioner guilty." [State's Brief, 35-361] And in discussing Petitioner's account of her whereabouts-and the alibi in particular-the State used terms such as "said" and "claimed," arguing that "she said she delivered the soup to Lael," "claimed that although Lael's truck was there, he did not answer when she knocked" and "said she did not use her key to take the soup in because she thought Lael might be sleeping." [State's Brief, 23 (emphasis added).] The State also points out that the trial court "acknowledged that Petitioner's evidentiary testimony must be viewed with some skepticism." [State's Brief, 23 (internal quotation marks omitted).]

. The majority concedes that "there is potentially some room to doubt the court's finding that Ms. Brown firmly established her whereabouts, even accepting the court's credibility findings." Supra ¶ 69 n. 69. But it argues that the clear and convincing evidentiary standard tolerates such doubt. Supra ¶ 69 n. 69.
As the majority notes, however, this evidentia-ry burden requires evidence that makes a conclusion "very highly probable." Supra ¶ 69 n. 69 (internal quotation marks omitted). And I struggle to see how Ms. Brown's evidence does so, as it fails to establish an alibi-the only reason that her whereabouts are even relevant. She put herself at the scene of the crime during a time when that crime might have been committed. And it accordingly does not maiter that there is only a narrow window of time during which she might have committed the murder, that there is some contrary evidence suggesting that the murder may have been committed during another time, or that the State has not proved that the murder occurred while she was there. Ms. Brown is the one who bore the burden of proof-of demonstrating her factual innocence by clear and convincing evidence-at the factual innocence hearing. And because she put herself at the scene of the crime during a time when the murder might have been committed, she failed to do so.
Even assuming that the time of death was later in the day, as the medical examiner testified it might have been, supra ¶ 24 (explaining that the time of death was likely between 9:00 p.m. and 3:00 a.m.), Ms. Brown's "alibi" for portions of this later time period still amounted to a mere denial of guilt. That, again, is no alibi. And it is not clear and convincing proof of factual innocence. Ms. Brown claimed she had fallen asleep at 8:00 or 8:30 pm. at her boyfriend's home, slept until about midnight, and then drove herself home, where she claimed to have remained for the rest of the night. Thus, even assuming that Lael Brown was killed in the evening, Ms. Brown was alone for an appreciable part of the time period during which the murder might have occurred. And it was her som-who perjured *515 himself at trial-who provided the only corroboration that she arrived home shortly after midnight. Thus, the fact that Ms. Brown placed herself at the scene of the crime during a time when the murder might have been committed is not the only deficiency in her alibi. If the doubt afforded under the clear and convincing standard allows an alibi as weak as Ms. Brown's to stand as proof of factual innocence, we have created a very low hurdle indeed.

. Even the majority recognizes that these factual conclusions are not unassailable. It notes "[wle readily recognize the existence of evidence in this case that calls into question the post-conviction court's factual findings. And we agree with the State that the court's ultimate determination of factual innocence is not the only reasonable conclusion to be drawn from the evidence." Supra ¶ 63 (internal quotation marks omitted).

. Review of the trial court's discussion shows that the only witness that the trial court found credible (Dale Hall) saw Lael Brown during the "early afternoon hours on Saturday, November 6th." At one point Hall said he saw Lael Brown at 1:00 p.m., and at another point at 2:30 p.m. Even assuming Hall was alive at both of those times, however, Ms. Brown's alibi is still unpersuasive. After all, she went to Lael Brown's house, by her own admission, between 2:00 and 3:00 (and was alone until 4:00), and there was no other testimony-including that by Carlsen, an individual previously "convicted of tampering with a witness" -that was, by itself, "sufficiently credible to establish by clear and convincing evidence that Lael was alive" at any time after 2:30 p.m. In fact, the trial court itself noted its "confidence" in the truthfulness of Carlsen's testimony was "low," such that his testimony was "not entitled to a significant amount of weight."

. I of course agree that alibis are always "self-serving," supra ¶ 70, in the sense of advancing the cause of the defense. But they are not always based on a defendant's (or her family members') simple denial of being present at the scene of the crime. A classic alibi involves objective evidence-a photograph, a hotel receipt, or the testimony of an objective third party. This case involves nothing of the sort. It involves mere denials by the defendant and by her loved ones. And even they-she-placed Ms. Brown at the scene of the crime at a time when it could have been committed.

. One of them, her son, did in fact lie for her, perjuring himself at her earlier trial. See supra ¶ 62 n. 49. And he is the sole witness as to Ms. Brown's whereabouts late in the evening on Saturday and early in the morning on Sunday.